1  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
   DALE F. KINSELLA (SBN 063370)
2    dkinsella@kwikalaw.com
   AMBER H. MELIUS (SBN 227853)
3    amelius@kwikalaw.com
   DAVID W. SWIFT (SBN 235033)
4    dswift@kwikalaw.com
   808 Wilshire Boulevard, 3rd Floor
5  Santa Monica, California  90401
   Telephone: 310.566.9800
6  Facsimile: 310.566.9850

7  Attorneys for Plaintiffs JAYCEE
   DUGARD, individually, and as
8  GUARDIAN AD LITEM for her MINOR
   CHILDREN

9

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12

13 JAYCEE DUGARD, individually, and    | CASE NO. 3:11-cv-04718-CTB
   as GUARDIAN AD LITEM for her
14 MINOR CHILDREN,                      | **FIRST AMENDED COMPLAINT**
                                        | **FOR DAMAGES**
15             Plaintiffs,

16      vs.                             | Complaint Filed: September 22, 2011

17 THE UNITED STATES OF
   AMERICA, and DOES 1 through 50,
18 inclusive,

19             Defendants.

20

21

22

23

24

25

26

27

28

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

10471.00003/142820.1                          3:11-cv-04718-CTB

1

## INTRODUCTION

2      1.      For nearly the entirety of their lives, plaintiffs Jaycee Dugard

3  ("Jaycee") and her two daughters were held captive, abused and irreparably

4  damaged by a deranged and maniacal felon, Phillip Garrido.  In 1991, Garrido

5  kidnapped 11-year old Jaycee outside of her home and drove her miles away to his

6  mother's residence in Antioch, California to become his private possession.  There

7  he sequestered Jaycee in ragged sheds and tent-like structures in his backyard –

8  removed from any semblance of normalcy and functioning society – where he raped

9  Jaycee hundreds of times and over the course of many years.  It was also there that

10  Jaycee's two daughters, each fathered by Garrido, were born and raised in the

11  grotesque dysfunction that Garrido created and perpetuated.

12      2.      Garrido should have been in federal prison in 1991.  In 1977, Garrido

13  was convicted of kidnapping and forcible rape and was sentenced to 50 years in

14  federal prison.  Rather than being released in 2027, however, Garrido was released

15  on parole in 1988, after serving less than 11 years of his 50-year sentence.

16      3.      After he was released on parole, Garrido immediately violated the

17  conditions of his parole, which should have resulted in Garrido's parole being

18  revoked and Garrido being returned to federal prison.

19      4.      Indeed, within his first couple of years of being paroled, Garrido tested

20  positive multiple times for drugs and alcohol – including, without limitation,

21  methamphetamines, amphetamines and marijuana, all serious parole violations for a

22  sex offender.  One such test showed that Garrido's blood alcohol level was 0.45% –

23  a reading typically associated with unconsciousness and possible death.  When

24  confronted by his parole officer about his positive test results, Garrido admitted to

25  using drugs and alcohol and also admitted to "flushing" his system with excessive

26  amounts of water at other times to avoid producing positive drug test results.

27  Despite the U.S. Parole Commission's "zero tolerance" policy regarding drug use

28  for parolees and despite the violations of Garrido's special conditions of parole,

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   Garrido's parole officers did not report Garrido's illegal drug use or alcohol use to

2   the Parole Commission as required by law.

3         5.      In addition to the drug and alcohol violations, federal authorities were

4   also aware of Garrido's continuing endangerment to society, and women in

5   particular.  Garrido's federal parole officers, therapists and counselors described him

6   at various times throughout his federal parole term as follows: "a time bomb," "like

7   a pot boiling with no outlet valve," "potentially very volatile," "potential for causing

8   great physical harm is present," "problems with sexual overtones," "did not seem

9   honest…as if he was putting on an act," "possible danger to the community is high,"

10  "major problems are presented in this case," "there is always threat of repeat

11  [kidnap/rape]," "still seems dangerous to the public… is liable to give little or no

12  warning," "substantial risk to women," "is always a threat to women," "potential

13  rapist."

14        6.      Despite Garrido's well-known propensities, federal parole authorities

15  ignored report after report of sexual misconduct by Garrido.  For example, Garrido's

16  parole officers were informed by his 1976 rape victim that, shortly after being

17  paroled, Garrido appeared at her workplace and made an alarming comment to her.

18  Inexplicably, the federal parole authorities responsible for Garrido's direct

19  supervision disregarded the victim's concerns as mere "hysteria" even though

20  Garrido's time cards indicated he was not at work during the hours he was alleged to

21  have been seen by the victim.  Upon learning of the victim's statement, Garrido's

22  own counselor suggested that Garrido be placed on electronic monitoring.  Garrido's

23  parole officer, however, ignored this recommendation and concluded that "to subject

24  this individual to electronic monitoring would be too much of a hassle…."

25        7.      In addition, on or about the one-year anniversary of Garrido's federal

26  parole supervision, his parole officer learned that a co-worker at the nursing home

27  where Garrido was employed had made charges of sexual harassment against

28  Garrido.  Four months later, another young woman was forced to quit her job at the

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  nursing home due to Garrido's unsolicited and unwanted "attention."  Shockingly,

2  federal parole authorities never followed up on any of these claims and failed to

3  bring these alarming incidents to the attention of the Parole Commission.

4       8.    With this type of resume, it is hard to imagine that Garrido, a parolee

5  classified as "High Activity" supervision, would have received anything other than

6  the utmost scrutiny and supervision by federal parole authorities.  Garrido, however,

7  received nothing of the sort.  In fact, although mandated to conduct monthly

8  personal visits with Garrido, federal parole officers routinely went months at a time

9  without seeing Garrido and even failed to make a single visit to Garrido's home

10  during at least three of the 10 years he was under federal parole supervision – most

11  notably, in 1990 (the year immediately prior to Jaycee's abduction), 1992 (the year

12  immediately following Jaycee's abduction) and 1994 (the year Jaycee gave birth to

13  her first daughter).  Indeed, during the decade Garrido was under federal parole

14  watch, the parole officers who supervised Garrido visited him at his residence less

15  than a dozen times total.

16       9.    Truly, the failures of federal parole authorities in handling Garrido's

17  case management are as outrageous and inexcusable as they are numerous.  Thus,

18  despite Garrido's countless parole violations and warning signs, Garrido remained

19  out on parole, such that in 1991 – three years after he was released from federal

20  prison – Garrido was free to kidnap 11-year-old Jaycee and to harbor her in his

21  backyard for 18 years.  Had federal parole authorities demonstrated a modicum of

22  vigilance – indeed, had they simply performed their duties and obligations as

23  required by federal law and internal policies – Jaycee and her daughters would not

24  have been forced to endure a virtual lifetime of physical and mental abuse from a

25  detonated "time bomb."

26  / / /

27  / / /

28  / / /

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## PARTIES

10.    Both currently and at the time of the acts giving rise to the cause(s) of action alleged herein, Jaycee is and was a citizen of the State of California and resident within the jurisdiction of this Court.

11.    Jaycee is the mother and custodial parent of two minor daughters, born August 18, 1994 and November 13, 1997, who are also citizens of the State of California and resident within the jurisdiction of this Court.  Jaycee brings this action on behalf of herself and also as Guardian Ad Litem for her two daughters (collectively, "Plaintiffs").

12.    Pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* ("FTCA"), Defendant United States of America ("United States") is the proper party defendant in this action for damages and personal injury resulting from the unlawful actions and omissions of its agencies, the United States Probation Office ("USPO"), the Federal Bureau of Prisons ("BOP"), and the agents and employees thereof.

13.    Plaintiffs are unaware of the true names and capacities of the defendants sued herein as Does 1 through 50, inclusive, and Plaintiffs therefore sue these defendants by fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of these defendants when ascertained.  Plaintiffs allege, on information and belief, that each of the fictitiously named defendants is responsible for the occurrences herein alleged, and that the damages sustained by Plaintiffs were proximately caused by each of the fictitiously named defendants' conduct.

14.    Plaintiffs are informed and believe and on that basis allege that Defendant United States and Does 1-50, inclusive (collectively, "Defendant") were at all times mentioned the agents, servants and employees of each other, or otherwise acting with the full knowledge and consent of each other.  Plaintiffs are further informed and believe and on that basis allege that in doing all of the things alleged in this Complaint, Defendant was acting within the scope and authority of

1   their agency, servitude or employment or otherwise within the scope of such

2   knowledge and consent.

3       15.   Pursuant to 28 U.S.C. § 2401(b), Plaintiffs timely filed administrative

4   tort claims for the events and incidents described throughout this Complaint.  By

5   letter dated May 6, 2011, Defendant informed that Plaintiffs' administrative claims

6   were denied.

7

8                           **JURISDICTION AND VENUE**

9       16.   This Court has jurisdiction of this action by virtue of the Federal Tort

10  Claims Act, 28 U.S.C. § 1346(b), *et seq*. and 28 U.S.C. § 2671, *et seq*.

11      17.   Pursuant to 28 U.S.C. § 1402(b), venue is proper in this Court because

12  Plaintiffs reside in the district and because some of the events or omissions which

13  give rise to Plaintiffs' claims occurred in this district.

14

15                            **STATEMENT OF FACTS**

16      A.   **Garrido Is Convicted of Rape and Kidnapping and Sentenced to 50**

17           **Years in Federal Prison and Five Years to Life In State Prison**

18      18.   Garrido's criminal past is extensive, complicated and, above all,

19  remarkably terrifying.  Garrido spent the 1970s indulging in one vice after another:

20  LSD trips, cocaine binges, marijuana smoking, public masturbation and perverted

21  sex.

22      19.   In 1972, Garrido was arrested and charged with rape, contributing to

23  the delinquency of a minor and providing dangerous drugs to a minor after he and

24  another adult male picked up a 14-year-old girl and her friend near a public library

25  and, after giving the two girls barbiturates, took them to a local motel and raped

26  them.  The case was dropped after the victim refused to testify.

27  / / /

28  / / /

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

20.    In June 1976, Garrido struck again.  This time, he talked his 19-year-old female victim into his car.  He then handcuffed her, kidnapped her and raped her.  Once again, Garrido escaped conviction.

21.    Then, on November 22, 1976, Garrido found a new way to satisfy his twisted sexual fantasies.  Garrido, 25 years old and high after taking multiple hits of LSD, abducted a young woman in the Tahoe area, bound and handcuffed her, and drove her miles away to a storage unit in Reno.  Over a six-hour period, Garrido repeatedly raped the victim in the storage unit, which he had set up in advance for this purpose.  The investigator in the case described the storage unit as a "sex palace," with various sex aids, a movie projector, pornography, stage lights and alcohol.  At 3:00 a.m. the next morning, a police officer on routine patrol noticed a broken lock on the shed and investigated.  This led to the rescue of the victim and the arrest of Garrido.

22.    For this latest crime, Garrido was tried in a Nevada federal court in February 1977.  At his trial, Garrido's attorneys argued that he was not guilty by reason of insanity.  A psychiatrist also testified that Garrido suffered from deep-rooted sexual obsessions.

23.    Garrido himself testified that he regularly masturbated in public and exposed himself to girls as young as seven years old.  Garrido further testified that he used drugs as sexual stimulants while masturbating at the "side of schools, grammar schools and high schools, in my own car while I was watching young females."

24.    Garrido showed absolutely no remorse for his crimes, instead testifying that he was the victim of his own sexual fantasies.  Garrido said that: "I have had this fantasy, and this sexual thing has overcome me.  I had this fantasy that was driving me to do this, inside of me… something that was making me want to do it without—no way to stop it."

/ / /

25.     The psychiatrist diagnosed Garrido as having "multiple sexual deviation" possibly triggered by four years of daily LSD use, along with routine abuse of marijuana, alcohol and cocaine.  Garrido's psychiatrist wrote in his report that Garrido's condition was "usually associated with compulsive masturbation. This aspect is clearly present in this man and is part of his multiple sexual deviation."

26.     At the conclusion of trial, Garrido was found guilty of kidnapping and given a 50-year federal sentence.  Garrido was subsequently tried on rape charges in a Nevada state court, where he was found guilty and sentenced to five years to life for forcible rape.  It was ordered that Garrido's two sentences would be served concurrently.

**B.     After a 35-Minute Jailhouse Interview, Garrido is Released From Federal Prison Less Than 11 Years Into His 50-Year Sentence**

27.     On information and belief, on November 5, 1987, in a highly unusual turn of events, examiners conducted a 35-minute jailhouse interview with Garrido to discuss his possible parole from federal prison.  Neither the federal prosecutor nor Garrido's defense lawyer were in attendance.  After the 35-minute meeting and without reviewing Garrido's complete records, the examiners made a unanimous recommendation to the parole board to release Garrido – even though he had served only 10½ years of his 50-year sentence.

28.     On January 20, 1988, Garrido was paroled from federal prison, where he was turned over to Nevada state authorities to serve the remainder of his state prison sentence.  Inexplicably, Garrido was paroled from Nevada prison a mere eight months later in August 1988.  At that time, Garrido was transferred back to federal jurisdiction where he was immediately sent to a halfway house as a condition of his federal parole.

/ / /

/ / /

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

29.     In December 1988, following his time at the halfway house, Garrido was returned to the community under supervision of the USPO for the Northern District of California to serve out his federal parole term.

30.     Garrido would remain under federal parole supervision for roughly 10 years, until March 1999, when his supervision was terminated early and responsibility was thereafter transferred to the state of California.

### C.   While on Federal Parole, Garrido Abducts Jaycee Dugard

31.     On June 10, 1991, less than three years after he was paroled and while still under federal parole supervision, Garrido kidnapped Jaycee as she began her school day.  Garrido and his wife Nancy had gone on a "shopping trip" that day for a young girl for Garrido.  They found Jaycee.

32.     Jaycee, at that time, was 11 years old.  That morning, she woke up in her parents' home in South Lake Tahoe, California and, as with any other school day, began walking the couple of blocks to her school bus stop.  As Jaycee's stepfather watched her from the driveway of their home, a car with a male and female couple inside pulled up alongside Jaycee, grabbed her into the car and sped away.  Jaycee's stepfather heard Jaycee scream, quickly jumped on a bicycle and pedaled frantically after the car in what was ultimately a failed effort to follow it up a hill.  That was the last time Jaycee was seen by her family – indeed, by virtually anyone – until nearly 18 years later.

### D.   Held Captive For Almost All Of Their Lives, Plaintiffs Endure A Living Nightmare At The Hands Of Garrido

33.     When Jaycee was abducted by Garrido in 1991, she was taken to the home of Garrido's mother in Antioch, California.  Garrido had apparently already made preparations for Jaycee's arrival.

34.     Tucked in the backyard behind a six-foot-high wall, Garrido had devised a secret lair – an above-ground catacomb of sheds and tents.  It was primitive, yet at the same time disturbingly complex.  Several of the ragged

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   structures, for example, had electricity that was powered by extension cords running

2   from Garrido's house.  There was also a makeshift outhouse and shower.  The sheds

3   were each locked from the outside, and one of the them was soundproof – both of

4   which features facilitated the sordid purposes for which Garrido would use the

5   structures.  A vehicle like the one used in Jaycee's abduction was also there hidden

6   beneath a tarp.  All of this was situated in an overgrown backyard littered with

7   rubbish and debris.

8        35.    It was here, in Garrido's backyard compound, that Jaycee was locked

9   away for not weeks, not months, but years.  It was also here, in Garrido's backyard,

10  that Jaycee became a habitual victim of Garrido's sexual depravity.

11       36.    Jaycee was Garrido's sex slave.  Over the course of years, Jaycee was

12  raped scores of times by Garrido, who frequently used drugs like speed to keep

13  Jaycee awake so he could repeatedly rape her.  From the age of 11, Jaycee was made

14  to dress-up in strange clothing and wear make-up to "role play" for Garrido's sexual

15  gratification.  She was also made to perform twisted and perverted sexual acts on

16  Garrido, as Garrido also did on her.  These are things no child should ever witness,

17  let alone experience.  Yet Jaycee experienced these things regularly for over 15

18  years.

19       37.    Amidst this unfathomable sexual abuse, Jaycee gave birth to two

20  daughters fathered by Garrido.  Jaycee was just 14 when her first daughter was born.

21  A little over three years later, she gave birth to her second.  Both of Jaycee's

22  children were born in the backyard, in the shed-like structures.  Unsurprisingly,

23  Jaycee received no prenatal care in connection with her pregnancies and did not

24  have the assistance of any doctor before, during or after the births of her children.

25       38.    Jaycee's two daughters grew up with Jaycee in Garrido's backyard

26  chamber.  All three lived in a practical state of isolation.  They received no medical

27  care, no formal education, no contact with the outside world.  Worse still, they were

28  perpetually subject to Garrido's command and abuse.  Jaycee's two minor

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   daughters, for example, were charged by Garrido with the daily care of his elderly,

2   demented mother and, in that role, were frequently subject to having to wipe up and

3   dispose of feces when Garrido's mother defecated herself.  Garrido also exploited

4   Jaycee as free labor for a printing business which he ran out of his home.

5       39.   In addition to these abuses, Jaycee and her children were also

6   psychologically and emotionally tortured by Garrido.  Garrido controlled Jaycee and

7   her children by intimidation and fear, leading Jaycee to believe that the Garrido

8   home was a "haven" in comparison to the dangers of the outside world.

9       40.   In fact, Garrido robbed Plaintiffs of not just their minds, but their entire

10  identities – even going so far as to manipulate Jaycee into denying to her own

11  children that she was their mother, instead telling them that she was their older sister

12  and that Nancy, Garrido's wife, was their mother.

13      41.   As Jaycee wrote in a July 5, 2004 diary entry, some 13 years after

14  being held captive and brainwashed by Garrido, "It feels like I'm sinking.  I'm

15  afraid I want control of my life ... this is supposed to be my life to do with what I

16  like ... but once again he has taken it away."  "How many times is he allowed to take

17  it away from me?  I'm afraid he doesn't see how the things he says makes me a

18  prisoner."  Tragically, at that point, it would be another five years – August 26, 2009

19  – before Jaycee and her children would be discovered, rescued from Garrido's

20  imprisonment and, importantly, given the ability to seek redress for their claims.

21     **E.**   **Defendant Made Flagrant Errors In Garrido's Supervision**

22          **Resulting In Jaycee's Continued Captivity And Torture**

23         **(1)**   **Defendant Ignored Facts Establishing that Garrido Would**

24             **Harm Again**

25      42.   From the start of his federal parole term, Garrido's propensity to harm

26  again was well-known to Defendant.  Indeed, Garrido's probation officers,

27  therapists and counselors described him at various times throughout his federal

28  parole supervision as follows: "a time bomb," "like a pot boiling with no outlet

1   valve," "potentially very volatile," "potential for causing great physical harm is

2   present," "problems with sexual overtones," "did not seem honest…as if he was

3   putting on an act," "possible danger to the community is high," "major problems are

4   presented in this case," "there is always threat of repeat [kidnap/rape]," "still seems

5   dangerous to the public… is liable to give little or no warning," "substantial risk to

6   women," "is always a threat to women," "potential rapist."  Despite being aware that

7   Garrido was extremely dangerous, federal parole authorities failed to supervise

8   Garrido adequately.  Instead, parole authorities inexplicably ignored dozens of

9   obvious warning signs.

10          43.     Shortly after his release on parole in August 1988, Garrido contacted

11  his former rape and kidnapping victim at her workplace, ominously calling out to

12  her, "Hi Katie, I have not had a drink in 11 years."  When this incident was reported

13  to Garrido's parole officer by the victim herself, the USPO disregarded her concerns

14  as mere "hysteria" even though Garrido's time cards indicated he was not at work

15  during those hours.  Upon learning of the victim's statement, Garrido's own

16  counselor suggested that Garrido be placed on electronic monitoring.  Garrido's

17  parole officer, however, ignored this recommendation and concluded that "to subject

18  this individual to electronic monitoring would be too much of a hassle…."

19          44.     On or about the one-year anniversary of Garrido's federal parole,

20  Garrido's parole officer learned that a co-worker at the nursing home where Garrido

21  was employed had made charges of sexual harassment against Garrido and that

22  other females at Garrido's workplace stated that they were very nervous in Garrido's

23  company and had refused his advances.  On information and belief, four months

24  later a young woman was forced to quit her job at the nursing home due to Garrido's

25  unsolicited and unwanted "attention."  Inexplicably, the USPO never followed up on

26  any of these claims and failed to bring these alarming incidents to the attention of

27  the Parole Commission.

28  / / /

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

### (2)    Defendant Failed to Report Garrido's Multiple Parole Violations

45.    Garrido also violated the conditions of his parole on countless occasions – including, but not limited to, the special conditions of his parole barring him from consumption of drugs and alcohol.  Indeed, Garrido tested positive for drugs and alcohol <u>no less than six times during his first year and a half</u> under federal parole supervision.  This tally is certain to have been more had Garrido not been routinely "flushing" his system with water in order to produce "false negatives," as he <u>admitted</u> to his parole officer and was known by the mental health counselor provided to Garrido as part of his parole condition.

46.    Garrido's parole officers had a mandatory non-discretionary duty to report Garrido's drug and alcohol violations to the Parole Commission, but failed to do so.  The following are just a few examples of Garrido's parole violations that should have been reported to the Parole Commission as required by law, but were not:

a.    On July 18, 1989, Garrido's parole officer noted that Garrido was taking prescription drugs without a prescription and that "This officer is concerned that subject may be obtaining unprescribed medications at the nursing home where he is employed."

b.    On August 1, 1989, Garrido's parole officer noted that Garrido was believed to be "self-medicating."

c.    On August 25, 1989, Garrido's parole officer noted that Garrido's urine specimen was "almost water."

d.    On September 5, 1989, Garrido's parole officer noted that Garrido's urine test results indicate that specimen may have been diluted.

e.    On September 20, 1989, Garrido's parole officer noted that "flushing suspected" regarding Garrido urine samples.

f.    On September 22, 1989, Garrido's urine tested positive for speed.

g.   On September 25, 1989, Garrido's urine tested positive for methamphetamine.

h.   On October 5, 1989, Garrido told parole agent he has been "using speed for about a month...and used pot since his release from [the halfway house]....admitted flushing."

i.   On October 10, 1989, Garrido tested positive for speed.

j.   On October 13, 1989, Garrido tested positive for amphetamines.

k.   On November 9, 1989, Garrido tested positive for methamphetamine.

l.   On November 13, 1989, Garrido tested positive for methamphetamine.

m.   On February 5, 1990, Garrido missed an appointment with his parole agent.

n.   On February 20, 1990, Garrido's counselor informed Garrido's federal parole agent that Garrido's urine test was "watered down."

o.   On February 26, 1990, Garrido submitted a watered down urine sample.

p.   On July 5, 1990, Garrido submitted a watered down urine sample.

q.   On July 20, 1990, Garrido submitted a watered down urine sample.

r.   On July 26, 1990, Garrido submitted a watered down urine sample.

s.   On August 6, 1990, Garrido tested positive for speed.

t.   On August 16, 1990, Garrido submitted a watered down urine sample.

u.   On August 20, 1990, Garrido submitted a watered down urine sample.

v.   On August 22, 1990, Garrido told his parole officer that Garrido "did take drugs at the party..."

w.   On September 6, 1990, Garrido submitted a watered down urine sample.

x.   On September 10, 1990, Garrido submitted a watered down urine sample.

/ / /

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

y.  On September 20, 1990, Garrido submitted a watered down urine sample.

z.  On November 2, 1990, Garrido's parole officer was informed that Garrido was no longer working at nursing home and that employees have reported that Garrido had contacted them looking for connections to purchase drugs.

aa.  On October 4, 1990, Garrido submitted a watered down urine sample.

bb.  On February 10, 1993, Garrido failed to show up for an appointment with his parole agent.

cc.  On July 28, 1993, Garrido's parole officer noted that Garrido provided a "cold and appeared to be altered sample" for his drug test.  Garrido's parole officer also noted that Garrido "may be using illegal substance as well.... Potential danger in the community is high."

dd.  On August 11, 1993, Garrido's parole officer learned that Garrido's July drug test was positive for methamphetamines.  Instead of reporting this violation as required, Garrido's parole officer noted that he needed to "review the subject's drug aftercare condition and see if the defendant has tested positively previously."  Of course, Garrido had multiple instances of either positive tests, illegal use of prescription drugs, or attempts to alter tests by flushing or watering down, and Garrido had admitted to using marijuana since his release, using speed, and flushing.  Nevertheless, Garrido's parole officer did not make a follow-up report regarding Garrido's July violation or any of his previous violations.

47.  When viewing this colossal series of failures and violations of duties by the USPO, it is clear that the USPO's gross neglect borders on virtual complicity.

/ / /

/ / /

10471.00003/142820.1

14

FIRST AMENDED COMPLAINT

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**(3)     Defendant Ignored Existence of Garrido's Backyard Sheds**

48.     One month before Jaycee was abducted and during one of the few home searches conducted during his federal supervision period, Garrido took his parole officer on a tour of the Antioch property.  The tour was complete with a visit to Garrido's backyard lair and <u>the very soundproofed studio where he would soon imprison and repeatedly rape and drug Jaycee</u>.  Garrido's parole officer recorded the home visit in his supervision log, writing that the studio "although small is very well equipped."

49.     Notwithstanding knowledge of the extent of Garrido's property and the existence of other structures thereon, Defendant was inexplicably unconcerned with Garrido's concealed compound <u>and never searched the area again</u>.

**(4)     Defendant Ignored Requirements to See Garrido Once a Month**

50.     Based on the nature of Garrido's criminal offenses and his difficulty in establishing and maintaining personal stability, Garrido was placed under "High Activity" supervision.  "High Activity" supervision mandates a minimum of one face-to-face personal contact per month between parolee and parole officer.

51.     Garrido's supervision during the first six months was not in accordance with the minimum monthly contact standard.  Garrido was seen by his parole officer in the office once and at the job site once during this time.  Alarmingly, the USPO did not conduct Garrido's initial home visit until six months after supervision began.

52.     Indeed, Garrido's parole officers routinely went months at a time without seeing Garrido and failed to make even a single visit to Garrido's home during at least three years (1990, 1992 and 1994) of the over 10 years he was under federal parole supervision.  On information and belief, from shortly after the date of Jaycee's kidnapping, <u>federal parole officers did not attempt a single visit to Garrido's home for 40 straight months (from December 1991 to May 1995)</u>.

/ / /

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

**(5)    Defendant Ignored Requirements to Furnish State
Authorities with Information about Garrido**

53.     Defendant was also irresponsible in its dealings with other state parole authorities.  In 1999, Garrido's parole was transferred from federal supervision to the state of California.  At that time, however, federal parole authorities failed to timely turn over to California parole authorities their records on Garrido, as required.  Included in this file was valuable information about Garrido's mental health assessments, failed drug and alcohol tests and 1993 parole revocation.  Most importantly, however, was information in the file notifying of the existence of Garrido's backyard sheds where Jaycee and her daughters were being kept, but which California authorities were unaware of.

## FIRST CLAIM FOR RELIEF

### (Against Defendant for Negligent Supervision)

54.     Plaintiffs refer to paragraphs 1 through 53 of this Complaint and reallege each and every allegation as though fully set forth herein.

55.     Garrido's 10 years under federal parole supervision did not serve to rehabilitate him.  Rather, throughout this time, Garrido remained an imminent threat to society and young women in particular.

56.     Notwithstanding the dangerous and erratic behavior noted above, Defendant failed to properly supervise Garrido and take the necessary steps to ensure that he would not offend again.  Indeed, Defendant failed to comply with multiple requirements governing Garrido's parole supervision, including, without limitation, those set forth in the U.S. Parole Commission Rules and Procedures Manual, 28 C.F.R. §2.1 *et seq*. (the "Parole Commission Rules") and the Administrative Office of the U.S. Courts, Publication 106, *The Supervision Process* ("Publication 106") and Monograph 109, *The Supervision of Federal Offenders* ("Monograph 109"):

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

a.  The Parole Commission Rules required Garrido's parole officers to submit regular supervision reports regarding Garrido's progress, or lack thereof, while on parole.  Pursuant to these Rules, "A supervision report <u>shall</u> be submitted by the responsible probation officer to the Commission for each parolee after the completion of 24 months of continuous supervision and annually thereafter.  The probation officer <u>shall</u> submit such additional reports as the Commission may direct." [§2.42.]  On information and belief, Defendant failed to submit the required annual reports regarding Garrido for one or more years.

b.  Pursuant to Monograph 109, every six months during the term, parole officers are <u>required</u> to complete a Semi-Annual Status Report and Revised Plan ("SASR").  The parole officer is required to identify supervision issues, which are either conditions of supervision, offender characteristics, or patterns of behavior that require intervention by the officer to control or correct.  On information and belief, Defendant failed to submit SASRs for Garrido for one or more required periods.

c.  Pursuant to the Parole Commission Rules and Publication 106, the "High Activity" supervision level mandates a <u>minimum</u> of one face-to-face personal contact per month between the parolee and his or her probation officer.  [Appendix 5.]  On information and belief, Defendant consistently failed to meet the requirement of monthly personal contact with Garrido, a "High Activity" parolee, and even failed to make a single visit to Garrido at his home for over a year.

d.  Pursuant to Publication 106, Defendant was <u>required</u> to complete an initial supervision plan for Garrido immediately upon his receipt for supervision and, in any event, no later than 30 days thereafter.  [Ch. II, p.4.]  Defendant, however, did not complete Garrido's initial

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  supervision plan until eight months after his federal parole supervision
2  began.

3  e.     Pursuant to Monograph 109, a parolee's initial assessment period <u>shall</u>
4  not exceed 60 days.  [Ch. III, p.14.]  Nonetheless, Defendant failed to
5  follow this requirement when, following a brief revocation of Garrido's
6  parole in 1993, Garrido's parole officer did not complete his new
7  supervision plan until March 1994 – six months after required.

8  f.     Statutory law specifically prescribes a course of action that Defendant
9  was required to follow each and every time Garrido tested positive for
10  drug use.  Specifically, pursuant to the Parole Commission Rules, the
11  Commission's policy is one of "zero tolerance" regarding illegal drug
12  use by parolees and any instance of illegal drug use by any parolee
13  <u>must</u> be reported by the probation officer to the Commission.  [§ 2.40-
14  13(c).]  The Parole Commission Rules thus <u>required</u> Garrido's parole
15  officers to report Garrido's illegal drug use to the Parole Commission.
16  Contrary to mandatory requirements established by the Parole
17  Commission Rules, Defendant failed to report Garrido's prolific and
18  well-known drug use to the Parole Commission.

19  g.     On information and belief, the Parole Commission imposed a special
20  condition on Garrido's parole barring him from the use of alcoholic
21  beverages.  The Parole Commission Rules <u>required</u> Defendant to report
22  to the Parole Commission any violation by Garrido of a special
23  condition of parole.  [§ 2.42-02(b).]  Despite this mandate, Defendant
24  failed to report Garrido's alcohol violations as required.

25  57.    But for Defendant's negligent failure to perform these and other duties
26  as required by law and internal policies and procedures, Defendant would have
27  recognized the immense danger posed by Garrido and revoked his parole.  Garrido

28

1 therefore would not have been free to kidnap Jaycee in 1991 or otherwise cause

2 injury to Plaintiffs.

3       58.    As a direct and proximate result of Defendant's negligence, Plaintiffs

4 have been damaged in an amount that has not yet been ascertained but which is in

5 excess of the minimum jurisdictional amount of this Court.

6

7 **SECOND CLAIM FOR RELIEF**

8 **(Against Defendant for Negligent Failure to Consider All Relevant Information**

9 **in Reaching Parole Decision)**

10       59.    Plaintiffs refer to paragraphs 1 through 58 of this Complaint and

11 reallege each and every allegation as though fully set forth herein.

12       60.    Prior to the decision to parole Garrido, the BOP had an affirmative,

13 non-discretionary duty to provide the parole board with Garrido's records upon

14 request of the parole board.  [18 U.S.C. § 4207]

15       61.    On information and belief, the BOP did not provide the parole board

16 with Garrido's complete records, and thus the parole board did not consider the

17 required records in determining whether to release Garrido on parole.

18       62.    Defendant thus released Garrido without considering the records it was

19 required by law to consider.  For example, on information and belief, Defendant did

20 not review Garrido's trial record or psychiatric reports.  On information and belief,

21 included in the records were psychiatric reports detailing Garrido's sexual deviation

22 and Garrido's trial testimony evidencing Garrido's lack of remorse for his actions.

23       63.    Had Defendant not breached its mandatory non-discretionary duties as

24 described above, Garrido would not have been granted early parole and would not

25 have been free to kidnap Jaycee in 1991 or otherwise cause injury to Plaintiffs.

26       64.    As a direct and proximate result of Defendant's negligence, Plaintiffs

27 have been damaged in an amount that has not yet been ascertained but which is in

28 excess of the minimum jurisdictional amount of this court.

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

## THIRD CLAIM FOR RELIEF

### (Against Defendant for Failure to Conduct Mental Health Examination)

65.     Plaintiffs refer to paragraphs 1 through 64 of this Complaint and reallege each and every allegation as though fully set forth herein.

66.     At all relevant times herein, Defendant had an affirmative, non-discretionary duty to examine inmates who were alleged to be insane or of unsound mind or otherwise defective and report the findings to the Attorney General.  [18 U.S.C. § 4241]

67.     Once committed, the prisoner was required to remain hospitalized "until in the judgment of the superintendent of said hospital, the prisoner shall be restored to sanity or health or until the maximum sentence, without deduction for good time or commutation of sentence, shall have been served."  [18 U.S.C. § 4241] On information and belief, at his federal kidnapping trial, as well as during his time in federal prison, Garrido was alleged to be insane or of unsound mind or otherwise defective.

68.     On information and belief, Defendant did not examine Garrido as required.

69.     Had Defendant performed this non-discretionary duty as described above, Garrido would have been placed in a mental institution for the remainder of his full federal prison sentence and would not have been free to kidnap Jaycee in 1991 or otherwise cause injury to Plaintiffs.

70.     As a direct and proximate result of Defendant's failures, Plaintiffs have been damaged in an amount that has not yet been ascertained but which is in excess of the minimum jurisdictional amount of this court.

/ / /

/ / /

/ / /

/ / /

1

2

3

## FOURTH CLAIM FOR RELIEF

### (Against Defendant for Negligent Failure to Provide Information Regarding Garrido to the State Authorities)

4       71.     Plaintiffs refer to paragraphs 1 through 70 of this Complaint and

5   reallege each and every allegation as though fully set forth herein.

6       72.     In 1999, when Garrido's parole responsibility was transferred to the

7   state of California, Defendant had an affirmative, non-discretionary duty to provide

8   information concerning Garrido to the state of California.  [18 U.S.C. § 4203]

9       73.     On information and belief, despite California's request for Garrido's

10  file, Defendant did not provide the entire parole file on Garrido to the state of

11  California.

12      74.     The federal parole file contained material information that would have

13  materially altered the way in which California parole authorities supervised Garrido.

14  Had California parole authorities had this information earlier, they would have

15  rescued Plaintiffs many years earlier.

16      75.     Included in the federal parole file was information about Garrido's

17  mental health assessments, failed drug and alcohol tests, and a 1993 probation

18  violation which led to Garrido being briefly detained.  This information would have

19  influenced the parole agent's supervision level for Garrido.

20      76.     Also included in the federal parole file was information regarding a

21  federal agent's search of the soundproofed studio that Garrido maintained in the

22  back of his residence.  Had Defendant provided this information to California parole

23  authorities, California parole authorities would have searched and discovered

24  Garrido's backyard compound and uncovered the presence of and rescued Plaintiffs.

25      77.     As a direct and proximate result of Defendant's negligence, Plaintiffs

26  have been damaged in an amount that has not yet been ascertained but which is in

27  excess of the minimum jurisdictional amount of this Court.

28  / / /

10471.00003/142820.1

21

FIRST AMENDED COMPLAINT

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1

## **Prayer For Relief**

2        WHEREFORE, Plaintiffs pray for judgment as follows:

3        1.      For general damages according to proof, but in excess of the minimum

4    jurisdictional amount of this Court;

5        2.      For special damages according to proof;

6        3.      For costs of suit herein incurred; and

7        4.      For such other and further relief as the Court deems just and proper.

8

9    DATED:  October 15, 2012          Respectfully submitted,
                                        KINSELLA WEITZMAN ISER KUMP &
10                                      ALDISERT LLP

11

12                                      By:    /s/  Dale F. Kinsella

13                                             Dale F. Kinsella
                                               Attorneys for Plaintiffs JAYCEE
14                                             DUGARD, individually, and as
                                               GUARDIAN AD LITEM for her MINOR
15                                             CHILDREN

16

17

18

19

20

21

22

23

24

25

26

27

28

**KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP**
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

10471.00003/142820.1

22

3:11-cv-04718-CTB

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 808 Wilshire Boulevard, 3rd Floor, Santa Monica, CA 90401.

On October 15, 2012, I served true copies of the following document(s) described as **FIRST AMENDED COMPLAINT FOR DAMAGES** on the interested parties in this action as follows:

Bridget Bailey Lipscomb
Deepthy Kishore
Torts Branch, Civil Division
U.S. Department of Justice
Benjamin Franklin Station
P.O. Box 888
Washington, D.C. 20044
bridget.lipscomb@usdoj.gov
deepthy.c.kishore@usdoj.gov
(202) 616-9356
Attorneys for Defendant United States of America

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.  Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on October 15, 2012, at Santa Monica, California.

_/s/ Nikki R. Shlosser_
Nikki R. Shlosser

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850