UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JAYCEE DUGARD, individually, and as
GUARDIAN AD LITEM for her MINOR
CHILD,

           Plaintiffs,

    v.

THE UNITED STATES OF AMERICA,
and DOES 1 through 50, inclusive,

           Defendants.

No. 3:11-cv-04718-CTB

Order GRANTING in part and
DENYING in part Defendant's
Motions to Dismiss, for Judgment
on the Pleadings, and for Summary
Judgment.

FILED UNDER SEAL

## Introduction

On June 10, 1991, Phillip Garrido kidnapped Jaycee Dugard at South Lake
Tahoe, California.  Jaycee was 11 years old.

Garrido took Jaycee to his house in Antioch, California, where he repeatedly
raped her and submitted her to unspeakable acts.  In the next few years he fathered
two children by her.  Garrido and his wife Nancy held Jaycee and her children in
captivity until their deliverance in 2009.

In 1977, Garrido had been convicted of federal charges of kidnapping and

forcible rape, and was sentenced to 50 years in federal prison. In 1988, however, he was freed on "supervised release," the name given to federal parole. Garrido remained on supervised release for ten years, during which federal parole officers were charged with the duty to supervise him.

Jaycee Dugard, for herself and her child A. Dugard, claims that, had the federal parole officers carried out certain mandatory duties of their parole supervision over Garrido, he would have suffered parole revocation, and he would have been in prison on June 10, 1991. Thus, Plaintiffs argue, Garrido would have been unable to kidnap Jaycee and visit upon her and her children the horrors that followed. They seek damages from the government under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*., for the failures of the parole officers which, they claim, resulted in Garrido's freedom and his ability to harm Jaycee and her children.

Defendant, United States of America, now moves to dismiss the Dugards' claims through a variety of procedural measures and upon various legal grounds. Most of its motions will be denied in whole or in substantial part.

However, its motion to dismiss for lack of subject matter jurisdiction and for summary judgment under the Federal Tort Claims Act because the United States owes Plaintiffs no duty of reasonable care under California tort law, must be granted. California tort law limits the duty of reasonable care owed by private individuals who have the power to control dangerous persons for rehabilitation purposes to specifically identifiable victims. Plaintiffs have not adduced any evidence sufficient to allow a reasonable trier of fact to conclude that during the time Garrido was allowed to be out of prison, Jaycee Dugard was a foreseeable, specifically identifiable victim of Garrido. California tort law thus bars Plaintiffs' claim for relief.

The government raises six grounds for dismissal of Dugards' action.[1]  The court will deal first with the grounds for dismissal of this action (lack of any duty of care to Plaintiffs) and then the remaining grounds, the majority of which are without merit.

## Background

The following facts are undisputed[2]: in 1977, Phillip Garrido was convicted of federal charges of kidnapping and forcible rape and sentenced to 50 years in federal prison.  Garrido was also convicted of forcible rape charges in Nevada state court in 1977 arising from the same facts as underlay the federal charges, and sentenced to five years to life.  Garrido was released from federal prison in January 1988 but remained under federal supervised release.  His supervision was turned over to Nevada authorities to serve the remainder of his state sentence.  He was released on parole from Nevada state prison in August 1988.  He remained subject to federal supervised release.  In December 1988, following six months at a halfway house, Garrido was released from confinement and placed under

---

[1] The government originally moved upon eight grounds.  Two of the grounds are now no longer before this court because Plaintiffs have abandoned the Second, Third, and Fourth Claims for Relief of their Second Amended Complaint ("SAC"), ECF 65 (filed 12/20/2012).  Thus, this court GRANTS all of the government's motions as to Plaintiffs' Second, Third, and Fourth Claims for Relief. Additionally, because the court dismisses this case, the government's three Motions *in Limine* filed on August 1, 2013, its Motion for an Offset for Settlement with California filed on August 1, 2013, and its Motion to Strike the Declarations of Rebecca Bailey and Janet Constantino filed on September 10, 2013, are moot. The court does not consider them.

[2] These facts of this paragraph are alleged in Plaintiffs' SAC, ECF 65, and admitted in the government's Answer, ECF 70.

3

supervised release by the United States Probation Office (USPO) for the Northern District of California.  SAC ¶ 29.  From 1988 until March 1999, Garrido remained under such federal parole supervision.  In March 1999, Garrido's federal supervised release was terminated and parole responsibility was transferred to the state of California.  On June 10, 1991, while still under federal supervised release, Garrido, with the help of his wife Nancy, kidnapped Jaycee Dugard, age 11, in South Lake Tahoe, California.  In the ensuing years, Dugard gave birth to two daughters fathered by Garrido.

The following facts are alleged but not admitted, and are considered only for the purposes of the government's motions pursuant to Fed. R. Civ. P. 12(b)(1) and 12(c):  Plaintiffs' SAC alleges that Garrido kept Dugard captive for those 18 years in a compound he had constructed in his back yard, and raped and drugged her regularly.  SAC, ECF 65 at ¶¶ 33–41.  Plaintiffs allege that the birth of the two children was without the aid of medical treatment or pre-natal care.  *Id.* at ¶ 37. Dugard and her daughters were discovered on August 26, 2009, more than 10 years after federal parole supervision was transferred to California authorities.  *Id.* at ¶ 41.

Through Plaintiffs' currently operative SAC, Jaycee Dugard brings this action under the Federal Tort Claims Act on her own behalf and on behalf of her minor daughter A. Dugard.  Plaintiffs allege that, at numerous points in 1989 and 1990, Garrido's supervising officers failed to report to the United States Parole Commission Garrido's numerous violations of the terms and conditions of his parole, including multiple instances of drug and alcohol abuse and Garrido's ingestion of excessive amounts of water to dilute his urine so as to pass periodic drug tests.  SAC ¶¶ 45–46, 56.  Plaintiffs allege that the officers were required to make such reports to the Commission.  Nor, Plaintiffs allege, did the federal

4

officers properly prepare or file certain mandatory supervision plans and annual reporting documents for Garrido.  *Id.* at ¶¶ 50, 56–57.  Had the officers performed these directives correctly as mandated, Plaintiffs allege, the Commission would have revoked Garrido's parole because of his violations, he would have been reincarcerated, and he therefore would not have been free to kidnap Jaycee Dugard in 1991 or otherwise cause injury to the Plaintiffs.  *Id.* at ¶ 57.  Thus, Plaintiffs' claim is for Negligent Supervision or Negligent Failure to Control.  *Id.* at ¶¶ 54–58.  The government now moves this court for dismissal for lack of subject matter jurisdiction, for judgment on the pleadings, or for summary judgment.

## Analysis

### I.  The government owes no duty to Plaintiffs under California law.

The Federal Torts Claims Act ("FTCA") is a limited waiver of the United States' sovereign immunity.  Whether the United States has waived sovereign immunity under the FTCA for a particular type of suit is a question of subject matter jurisdiction.  *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).  The FTCA provides:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .

28 U.S.C. § 2674.

Liability can arise from the

> negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  *See also Proud v. United States*, 723 F.2d 705, 707 (9th Cir. 1984) (proper liability standard is the "tort liability of a similarly situated private

5

individual"). The government moves to dismiss this suit for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) because private persons, under like circumstances to those that obtained for the government officers in this case, would not be liable to the Plaintiffs under California law.

Failure of a duty to perform mandatory federal functions does not itself give rise to a FTCA claim; rather, the source of substantive liability, under the FTCA, is law of the state in which the cause of action accrued. *FDIC v. Meyer*, 510 U.S. 471, 477–78 (1994). In California, as a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct. *Davidson v. City of Westminster*, 32 Cal. 3d 197, 203 (1982)[3]; *Beauchene v. Synanon Foundation, Inc.*, 88 Cal. App. 3d 342, 347 (1979). Exceptions to this rule have been recognized where a special relationship exists between the defendant and either the person whose conduct needs to be controlled or the foreseeable victim of the third party's conduct. *Rice v. Ctr. Point, Inc.*, 154 Cal. App. 4th 949, 955 (2007). The common law duty upon which Plaintiffs rest their claims has been summarized in the Restatement (Second) of Torts § 319 (1965):

> One who takes charge of a third person whom he knows or should know
> to be likely to cause bodily harm to others if not controlled is under a

---

[3] In *Davidson*, plaintiff was stabbed by an assailant in a laundromat that was under surveillance by city police officers. The officers were looking for a man who had attacked a laundromat patron the evening before. As the officers watched, the suspect entered the laundromat and attacked the plaintiff. She sued the city for failure to warn. The trial court sustained a general demurrer to her complaint, and the Supreme Court of California affirmed, stating "generally, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." *Id.* at 203. The court noted that an exception might be found to the general rule if a special relationship existed between the officers and the plaintiff or the tortfeasor, but because there was no special relationship among any of the parties, the officers owed plaintiff no duty of care. *Id.* at 209.

duty to exercise reasonable care to control the third person to prevent
him from doing such harm.

California has spoken approvingly of this Section,[4] but with modifications that here

will prove decisive. *Megeff v. Doland*, 123 Cal. App. 3d 251, 257 (Ct. App.

1981).[5]

---

[4] Plaintiffs' opposition brief made reference to *People v. Heitzman*, 9 Cal.
4th 189 (1994) for the proposition that § 319 is the "law of California." ECF 120
at 46. *Heitzman* was a criminal case in which a woman was charged with neglect
of her elderly father, even though her two brothers (who were also charged) were
the father's caretakers. The California Supreme Court held that the state neglect
statute was unconstitutionally vague under the United States and California
constitutions because it failed to provide adequate notice of the class of persons
who could be charged under it; the terms were not vague only to classes of persons
who owed some duty to control an abuser. *Id.* at 206, 212. The Court mentioned §
319 only for the hypothetical, in dicta, that had the woman had some control over
her *brothers* whom she knew to be abusing her father, she might have been found
criminally liable for their abuse of him. There was no mention of a hypothetical as
to foreseeability, and § 319 did not provide the rule of decision in the case. As
such, *Heitzman* is inapposite to this civil case. *Megeff*, *infra*, provides proper
guidance.

[5] In *Megeff*, a demented husband attacked his nurses in a hospital when the
nurses prevented him from going home. Shortly after the husband did return
home, he wandered outside and stabbed a neighbor with a sharp object, then
followed the neighbor into his apartment and stabbed another resident. Plaintiffs
sued the husband's wife for failure to control him, based on Restatement § 319.
The trial court granted the defendant wife judgment on the pleadings because it
found she owed no duty of care to plaintiffs. The California Court of Appeal
affirmed. It assumed *arguendo* that the wife had the ability to control the husband,
but found nevertheless that the single incident of physical aggression with his
nurses in the hospital when they tried to prevent him from going home created no
foreseeable risk that he would repeat that violence elsewhere or direct it at his
landlords and neighbors. The court held that the "duty created by section 319 is
not necessarily one owed to the world at large; the element of foreseeability
remains. The custodian must have knowledge of a specific risk to an identifiable

7

California has consistently narrowed the scope of the duty of care in cases where private parties provided criminal rehabilitative services, had control over the criminals, and were empowered to restrain, detain, or punish them as part of the rehabilitative process.  As recognized by the federal courts, California law holds that such private individuals—that is, private persons in like circumstances to those of the parole officers of this case—do not owe a duty of reasonable care to control others to the entire world or to the general public.  Rather, under California law, such duty of reasonable care to control is owed by such rehabilitative service providers only to a very small group of specifically identifiable and foreseeable victims.  The following cases so illustrate.

a.  California and federal cases.

In *Johnson v. State*, 69 Cal. 2d 782 (1968) the California Youth Authority placed a juvenile offender in foster care without informing the prospective foster parents of the "homicidal" proclivities of their soon-to-be ward.  *Id.* at 785.  Upon arrival at the foster parents' home, the offender assaulted the foster mother, who sued the state for negligent failure to warn.  The state claimed immunity, and also argued that no tort duty applied.  The trial court granted the state summary judgment. The Supreme Court of California reversed and remanded for trial.   It "dispos[ed] summarily of the contention . . . that the state owed no duty of care to plaintiff."  *Id.*  Unlike members of the "general public," the plaintiff foster mother was in "foreseeable peril" by virtue of her selection by the state to take on the particular ward.  *Id.* at 786, 799.

*Beauchene v. Synanon Foundation, Inc.*, 88 Cal. App. 3d 342 (1979) picked

---

and foreseeable victim."  *Id.* at 257.

up on *Johnson*'s language and applied it to private individuals engaged in criminal rehabilitative services, but to an opposite result.  Synanon was a "voluntary private rehabilitation institution that provide[d] a structured or controlled environment for its residents." *Id.* at 345.  Its primary purpose was "the rehabilitation of drug addicts, alcoholics, and other people with character disorders." *Id.*  With the prior approval of Synanon, California courts sent convicts for service of probation or parole to Synanon rather than to a county jail or state prison.  Bentley, a convicted burglar, was admitted to probation on condition that he enter the "Synanon program and not leave said program without prior approval of the Probation Officer and the staff of Synanon."  Five days after he entered Synanon, "in violation of the court's order and without the permission of the Synanon staff, [Bentley] 'escaped' from the program." *Id.*  Bentley then shot the plaintiff.

The plaintiff sued Synanon, in part, for failure of an "affirmative duty to prevent Bentley from leaving the program," and a failure "to control Bentley by not constructing 'improvements to some of their physical plants so as to render them secure enough to prevent their dangerous probation inmates from escaping.'" *Id.* at 346, 347.

The trial court sustained Synanon's general demurrer to the complaint and dismissed the case.  The Court of Appeal affirmed:

> [T]he same public policy that moved the Legislature to immunize public release and rehabilitation programs from liability—to encourage such innovations in the interests of criminal justice—compels the conclusion that respondent's private release and rehabilitation program owed no legal duty to this appellant. In light of the purpose behind the governmental immunity, it would be incongruous to hold that, while the state is immune from liability for its decision to assign Bentley to, and his unauthorized departure from, the Synanon program, the program itself owed appellant a duty not to accept Bentley *or to prevent his unauthorized departure*.

*Id.* at 348 (emphasis added).  The court concluded, citing *Johnson*, 69 Cal. 2d at

799, that the private rehabilitation center owed no duty to the "general public" to control its residents:

> Although appellant's injuries may be grievous, [of] paramount concern is the detrimental effect a finding of liability would have on prisoner release and rehabilitation programs. Were we to find a cause of action stated we would in effect be encouraging the detention of prisoners in disregard of their rights and society's needs . . . Each member of the general public who chances to come into contact with a parolee or probationer must risk that the rehabilitative effort will fail.

*Id.*, *quoting Johnson*, 69 Cal. App. 2d at 799.

*Thompson v. County of Alameda*, 27 Cal. 3d 741 (1980) further narrowed California's scope of foreseeability. Plaintiffs, a mother and father, lived a few doors down from the residence of the mother of a juvenile offender. The county knew that the offender had "indicated that he would, if released, take the life of a young child residing in the neighborhood"—although the offender gave no indication of which particular young child he intended to be his victim. *Id.* at 746. The county nevertheless released the offender to his mother, but warned neither the local police nor the parents of young children within the "immediate vicinity" of the offender's mother's house. *Id.* Within 24 hours of his release, the offender murdered the plaintiffs' son in the garage of the offender's mother's home.

Plaintiffs sued the county upon numerous causes of action, including breach of the duty to warn. The trial court sustained a general demurrer to the complaint and dismissed. The California Supreme Court affirmed. The Court based its decision "in part on policy considerations and in part upon an analysis of 'foreseeability.'" *Id.* at 753. With reference to *Johnson* and the much-cited case of *Tarasoff v. Regents of the University of California*, 17 Cal. 3d 425, 444 (1976) the Court stated:

> Unlike members of the general public, in *Tarasoff* and *Johnson* the potential victims were specifically known and designated individuals. The warnings which we therein required were directed at making those

10

individuals aware of the danger to which they were uniquely exposed. The threatened targets were precise.

*Id.* at 755.  As a result, the Court concluded,

> [W]henever a potentially dangerous offender is released and thereafter commits a crime, the *possibility of the commission of that crime is statistically foreseeable.*  Yet the Legislature has concluded that the benefits to society from rehabilitative release programs mandate their continuance.  Within this context and for policy reasons the duty to warn depends upon and arises from the existence of a prior threat to a specific identifiable victim . . . .  Despite the tragic events underlying the present complaint, plaintiffs' decedent was not a known, identifiable victim, but rather *a member of a large amorphous public group of potential targets*.

*Id.* at 758 (emphasis added).

California soon applied this narrowed scope of foreseeability, not only to duty-to-warn cases, but also to duty-to-control cases.  In *Brenneman v. State of California*, 208 Cal. App. 3d 812 (Ct. App. 1989), a paroled child molester murdered a 12 year-old paperboy in the parolee's neighborhood.  The boy's family brought an action grounded on claims that the state breached a duty to use reasonable care to control and to warn.  The state filed a general demurrer to the complaint, asserting "absence of any duty to control" the parolee or to "issue warnings" about him.  *Id.* at 816.  The trial court sustained the demurrer to the complaint and dismissed the action.  *Id.*[6]

The Court of Appeal held that the "general tort duties" to control and to warn were "generally treated as parallel" under California law.  *Id.* at 819, *citing Thompson* and *Hooks v. S. Cal. Permanente Med. Grp*., 107 Cal. App. 3d 435 (Ct. App. 1980).[7]  The court stated that "*Thompson* . . . cogently explains why we may

---

[6]  The court found on alternative grounds that the state had statutory immunity for its alleged negligence.  *Id.* at 820, *citing* Cal. Gov. Code § 854.8.

[7]  In *Hooks*, an obstetric nurse, Armistead, became friends with her eventual victim, Viramontes.  Armistead delivered the baby girl of a third person in the

hospital where she worked.  She then secretly substituted a stillborn child, told the mother her child had died, and took the living baby home to raise.  The hospital, however, made no investigation of the suspicious circumstances of the stillborn's death, including the abnormal fact that Armistead conducted the delivery by herself and the fact that the dead child's umbilical cord had been cut—a task reserved for physicians.  *Id.* at 439.

Some eight months later, Viramontes went into labor, and called Armistead for help.  Armistead arrived, but the two soon began to argue over Viramontes' relationship with Armistead's boyfriend.  Armistead killed Viramontes with a knife, then delivered the child, Hooks, by caesarian.  Hooks, by guardian, then brought action for Viramontes' wrongful death against Armistead and the hospital that employed her.

Hooks pleaded that because of the "special relationship between the Hospital and Armistead, Armistead being the employee whose aberrant and dangerous conduct needed to be controlled," the law "imposed a duty of care on the Hospital owed to a class of persons which included Viramontes."  *Id.* at 440.  The class of persons that, he alleged, was "foreseeably endangered by Armistead's conduct encompassed her friends who would rely on Armistead's professional skill, experience, and standing."  *Id.*  He specifically argued that the hospital breached a duty of care owed him.  *Id.* at 443.  The trial court entered summary judgment in favor of the hospital because the hospital owed no duty of care to Viramontes.

Hooks argued on appeal that his case was similar to *Tarasoff*.  The Court of Appeal noted that the Supreme Court in that case "predicat[ed]" the psychotherapist's duty to warn on the "existence of a special relationship," but that "*an even more important fact* in the imposition of liability was a foreseeable risk of harm to a foreseeable victim."  *Id.* at 444 (emphasis added).  The court continued:

> *Tarasoff* involved the highest degree of foreseeability. A psychotherapy patient with a past mental history expressed his intent to kill a specific person. This state of mind revealed an imminently foreseeable risk of harm to a readily identifiable victim.
>
> In contrast, the instant case does not involve anything near that degree of foreseeability.  Rather, it resembles closely a series of cases subsequent to *Tarasoff* which refused to extend liability.  The common thread running through these later cases is that to come within the *Tarasoff* rule of liability, the relationship involved must put one on

not find a duty to control *or* warn in this case." *Id.* (emphasis added).  It refuted plaintiffs' arguments that *Johnson* and *Tarasoff* supported a duty to control.  That argument, it said, was "rejected in *Thompson*, which . . . confined the special relationship exception to situations involving" either a relationship between the state and the plaintiff, or "a prior threat to a specific identifiable victim." *Id.* at 820.

The court concluded that "the juvenile perpetrator's threat, in *Thompson*, to kill a young child residing in the neighborhood did not suffice to render the victim 'specific' and 'identifiable.'" *Id.*  As a result, the plaintiffs' "allegations that [victim] was a paperboy residing in and serving [the offender's] neighborhood are not substantially distinguishable from the allegations *Thompson* held insufficient." It affirmed the trial court's dismissal. *Id.*

California meanwhile continued to use a narrow scope of foreseeability in duty to control cases involving private rehabilitation institutions.  In *Cardenas v.*

---

> notice that a specific, rather than a generalized, risk exists.  *Moreover, one must know that the target of the risk is an identifiable and foreseeable victim.*

*Id.* at 444 (emphasis added).  The court then explained how specific and identifiable a failure to control victim needed to be:

> In arguing that Viramontes was a foreseeable victim, Hooks really contends that the risk of harm encompassed all pregnant women anywhere who were acquainted with Armistead in any way during the period of her employment at the Hospital. *That sweeping class of persons* is nearly as broad as the "society at large" argument rejected in *McDowell*.

*Id.* at 445 (emphasis added), *citing McDowell v. County of Alameda*, 88 Cal. App. 3d 321, 325 (Ct. App. 1979).  For a discussion of *McDowell, see infra*, n. 10.

*Eggleston Youth Center*, 193 Cal. App. 3d 331 (1987), the plaintiff was shot by a resident of the Eggleston Youth Center while the plaintiff was at a local convenience store; the resident had obtained a pass to leave the center.  Plaintiffs sued the private program for negligent failure to control in contravention of a "duty to the general public."  *Id.* at 333.  The trial court sustained the defendant's general demurrer to the complaint: the center had no duty to the members of the community in which it was located.  The California Court of Appeal affirmed, and reasoned that no duty to control should extend to the general public because it would interfere with the state's policy to encourage private rehabilitation work.  *Id.* at 335.

 The recent case of *Rice v. Ctr. Point, Inc*., 154 Cal. App. 4th 949 (2007) is even more illustrative of California law as to the scope of the duty owed by private rehabilitation service providers.  In that case, Center Point Inc. operated the Humbolt Recovery Center, ("HRC"), which was a residential substance abuse institution.  HRC was licensed by the California Department of Alcohol and Drug Programs, and provided "a non-hospital 24–hour residential substance abuse program" and also "a special treatment program for 'criminal justice clients.'"  *Id.* at 952.

Four residents of the HRC stole a knife from the kitchen at night, crawled out a window, and stabbed the plaintiffs as they sat in a nearby park.  Plaintiffs sued Center Point for negligence based on a claimed breach of the duty to control. The trial court sustained Center Point's general demurrer to the complaint upon a finding that no such duty was owed to the plaintiffs.  Notably, as the Court of Appeal assumed, Center Point was in violation of several state requirements and mandatory internal policies, including that the doors of the center be locked and fitted with working alarms, that all knives be accounted for and secured, that daily

14

headcounts be performed, and that residents remain in the building after dark.  *Id.* at 953, 957.  The trial court acknowledged that such failures supported "plaintiffs' allegations of negligence in the operation of the treatment facility," but concluded nonetheless that the facility "did not owe plaintiffs a legal duty of care to control the criminal behavior of the residents of their treatment facility."  *Id.* at 952, 953–54.

The California Court of Appeal affirmed.  It first ruled that the center had no relationship with plaintiffs such that it owed a duty to them.  Such duty, it held, "is imposed only where the injury is foreseeable and the intended victim is identifiable."  *Id.* at 955, *citing Thompson*, 27 Cal. 3d at 752–53.  The "proximity of the park in which [plaintiffs] were attacked to the HRC facility," however, "does not render plaintiffs identifiable or otherwise separate them from other members of the general public."  *Id.*  It repeated: unlike the specifically identifiable foster mother in *Johnson*, the victims were not foreseeable "simply because they were present in or resided near" a park.  *Id.*

The court then held that no duty to the "general public" arose from the relationship between the center and its residents.  The court rejected plaintiffs' argument that the case differed from *Cardenas* and *Beauchene* because those cases involved acts of discretion to allow the residents to go into the surrounding neighborhoods, while in *Rice* there were negligent violations of actual mandatory directives: "[p]laintiffs' attempt to distinguish *Beauchene* and *Cardenas* based on violation of specific safety procedures . . . is not persuasive."  *Id.* at 958.  Rather, the center's failures could not give "rise to a duty where none otherwise existed. Defendants' failure to comply with applicable safety regulations would at most demonstrate a lack of reasonable care, *i.e.*, breach of the duty of care *if such a duty*

*were first determined to exist*."  *Id*. (emphasis added).

The court recognized that "duty" is the "expression of the sum total of those considerations of policy which lead the law to say that a particular plaintiff is entitled to protection."  *Id.*, *citing J'Aire Corp v. Gregory*, 24 Cal. 3d 799, 803 (1979).  The court then held that such a duty of reasonable care was not owed to the general public because

> the public policy of encouraging rehabilitation of criminal offenders, the lack of foreseeability of injury to an identifiable person, and the fact that the risk of injury is shared by all members of the general public militate against the imposition of a duty to exercise ordinary care in these circumstances.  The balance is not altered because defendants allegedly violated a particular policy or procedure.

*Id.* at 958.  "Accordingly," the court held,

> defendants' alleged failure to comply with any policy or procedures for the safe operation of a residential drug treatment facility does not alter the sound conclusion reached in *Beauchene* and *Cardenas* that a residential treatment facility does not owe a duty to the general public to exercise ordinary care to control the criminal behavior of its program participants.

*Id.* at 959.

What the court gleans from these California cases is that California's policies to protect private professionals rendering rehabilitation services to dangerous persons, whom the professionals control, and to encourage the rehabilitation of criminal offenders, outweighs its policy to compensate victims for injuries caused by such dangerous persons.  That is, unless the victim were specifically identifiable in advance of the injury.

Perhaps more important for this district court than its analysis of California case law is that the Ninth Circuit has specifically recognized that *Thompson*, *Beauchene*, and their progeny's requirement of the foreseeability of specifically

16

identifiable victims obtains in duty to control cases. In *Vu v. Singer Co.*, 706 F.2d
1027 (9th Cir. 1983), a Job Corps[8] center employed disadvantaged, at-risk youth,
some of whom were former criminal offenders. Some center members burgled a
nearby house and raped the woman who lived there. The victim and her husband
sued the residential center's owners under diversity jurisdiction, and properly
invoked California negligence law of failure to warn and failure to control.
Plaintiffs specifically argued that the center failed to take the disciplinary measures
required of it by the Code of Federal Regulations against the perpetrators when
they had been found in a "drunk or in a drugged state" or "exhibited violent
tendencies." *Id.* at 1028, *citing* 29 C.F.R. § 97a.97(a) and 29 U.S.C. § 932(a) and
(b) (Supp. 1981).[9] The district court first found that the victims were not in the
class of persons the Code of Federal Regulations meant to protect, and thus that the
federal regulations were not themselves sources of tort duty. *Id.* at 1028–29. *Cf.*
*Rice*, *ante* (mandatory directives not themselves the source of any tort duty). As

---

[8] "The Job Corps was created by the Economic Opportunity Act of 1964 . . .
. Its purpose is to assist disadvantaged young people toward useful employment by
providing vocational training, work experience and educational programs. The
Office of Economic Opportunity of the Department of Labor ('OEO') is authorized
to enter into contracts with private contractors for the operation of Job Corps
Centers where members are provided room and board and the local activities of the
corps are carried out." *Vu*, 706 F.2d at 1028.

[9] 29 C.F.R. § 97(a).97 (1977) permitted Job Corps supervisors to impose
sanctions against Job Corps members for possession of "unauthorized goods,"
which included "marijuana, depressants, stimulants, hallucinogens, tranquilizers,
and drug paraphernalia." 29 C.F.R. § 97(a).10. Section 97(a).97(4) expressly
permitted a Job Corps center to sanction infractions by numerous punishments,
including "Restriction to center grounds not exceeding 30 days." Additionally, 29
U.S.C. § 932 (Pub. L. 93-203, title IV, § 459) (1981 Supp.) directed that Job Corps
"standards of conduct shall be provided and stringently enforced."

for California's common law of tort, the district court held that the center did have a "special relationship" to those in its care.  *Id.* at 1029.  But, with approving citation to *Thompson*, the district court found no duty to warn because the victims were "nonspecific."  *Id.*   It granted summary judgment in favor of the defendant. *Id.* at 1028.

The Ninth Circuit affirmed.  It recognized the California courts had "extended this need for foreseeable identification of the victim to cases involving the duty to control as well as the duty to warn . . . . *one must know that the target of the risk is an identifiable and foreseeable victim.*"  *Id.* (emphasis in original), *citing Hooks*, 107 Cal. App. 3d at 444 and *McDowell v. County of Alameda*, 88 Cal. App. 3d 321, 325 (Ct. App. 1979).[10]  Policy considerations also strongly militated against finding that the Job Corps had a tort duty that might jeopardize its rehabilitation efforts.  *Id.* at 1030, *citing Beauchene*, 88 Cal. App. 3d at 348 (California public policy shields both public and private rehabilitation institutions from duty to prevent the tortious acts of their residents).  With these considerations in mind, the circuit concluded that  "Singer owed no duty to the Vus to warn of or to control the conduct of corps members."  *Id.* at 1031.

This court is bound by the Ninth Circuit's interpretation of California state

---

[10]  In *McDowell*, a public hospital placed Jones, a mentally ill man, into a cab, rather than into an ambulance, for transport to his private hospital.  On the way to the hospital Jones left the cab.  Several days later he murdered plaintiff's decedent.  The plaintiff sued the public hospital and claimed negligent supervision. The trial court granted the hospital's motion for judgment on the pleadings, and the California Court of Appeal affirmed.  It held that the defendants did not owe a "duty to society because Jones' behavior may constitute a danger to any person." 88 Cal. App. 3d at 325.  As an alternate ground for decision, it also ruled that the hospital had no special relationship with Jones or with the plaintiff.  *Id.*

18

law absent any later indication from the California courts that the previous interpretation was incorrect, or any contrary intervening United States Supreme Court decision.  *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co*., 219 F.3d 895, 903 (9th Cir. 2000); *Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003).  There has been no such ruling from the California courts (or the United States Supreme Court).


b.  Application.

Such California and Federal cases compel the conclusion that private individuals in California engaged in rehabilitative services will not be held liable to members of the general public for failure to employ reasonable care to control persons committed to their supervision or custody.  This is true even when the private individuals breach mandatory duties, the breach of which may have caused a plaintiff's injuries.

Plaintiffs' citations to authority to the contrary are unavailing.  First, Plaintiffs' counsel's repeated references at oral argument to *Poncher v. Brackett*, 55 Cal. Rptr. 59 (Cal. Ct. App. 1966) are not persuasive.[11]  That case long antedates California's later tight narrowing of the duty to control as developed in *McDowell*, (1979), *Beauchene*, (1979), *Hooks*, (1980), *Thompson* (1980), *Megeff*

---

[11]   In *Poncher*, a minor grandchild under the control of his grandparents injured plaintiff.  The plaintiff sued the grandparents for lack of control, and the trial court sustained the defendants' general demurrer to the complaint.  The Court of Appeal reversed, and, citing Restatement (Second) of Torts § 319, stated that because the plaintiff pleaded that "defendant grandparents had custody and control of their minor grandson," whom they knew was likely to "cause bodily harm to others if he was not controlled," it was error to sustain the general demurrer to plaintiff's complaint, which alleged duties to the "general public."  *Id.* at 60 n.1.

(1981), *Cardenas* (1987), *Brenneman* (1989), and *Rice* (2007).  The language

counsel cited from *Poncher*—"failed to exercise reasonable control to" prevent

"harm to others", *id.* at 62—is too broad a statement of the present law; California

has since delineated more precisely who *Poncher*'s general "others" may be,

particularly in rehabilitation control circumstances.[12]  Additionally, the defendants

in *Poncher*— two grandparents whose grandson injured a third party—are simply

not private persons "under like circumstances" to federal parole officers, as are

private rehabilitation professionals in California.  28 U.S.C. §§ 1346(b), 2674.

Although this court understands that, for federal employees to be in "like

circumstances" under the FTCA they do not need to be in "identical"

circumstances to those of a private party, the circumstances do need to be

"analogous."  *Doe v. U.S.*, 58 F.3d 494, 497 (9th Cir. 1995).[13]  This court finds that

---

[12]  Or even in non-rehabilitative circumstances.  *See, e.g.*, *Hooks*, *McDowell*,
and *Megeff*, *ante*.  *Megeff*, which was heard in the same Court of Appeal Second
District as *Poncher*, cited *Poncher* for the proposition that a general duty of a
parent to control a minor child existed, 123 Cal. App. 3d at 261, but did not cite
*Poncher* for its "general public" language on the determinative issue of to whom
what duty was owed.  Instead, it ruled that "the duty created by section 319 is not
necessarily one owed to the world at large; the element of foreseeability remains.
The custodian must have knowledge of a specific risk to an identifiable and
foreseeable victim."  *Id*. at 257, citing *Thompson* and *Hooks*.  It is difficult to
conclude that *Poncher*'s use of "others" in § 319 to include all members of the
public survived *Megeff*'s quoted, express language.

[13]  Doe sued the United States under the FTCA, alleging that the FBI had
revealed his identity as an international drug informant and placed him and his
family in danger of retribution.  *Id*. at 495.  The trial court granted the
government's motion to dismiss the tort claim for lack of subject matter
jurisdiction without stating reasons.  *Id*.  The Ninth Circuit reversed, and, disputing
the dissent's argument that no private person analogue existed because no private
person would be engaged in international drug eradication, stated that it would

California private rehabilitation professionals are more closely analogous to government officers charged with rehabilitation duties than they are to generic grandparents.[14]   *See United States v. Olson*, 546 U.S. 43, 47 (2005) (analogizing "federal mine inspectors" to "private persons who conduct safety inspections")[15]; *Indian Towing Co. v. United States*, 350 U.S. 61, 64–65 (1955)[16] (allegations of

---

allow Doe leave to amend to allege a tort cause of action and facts that might show that a private person could act similarly in "analogous" circumstances—such as, the court suggested, those of a private company who exposed an employee to danger and torture during a trade secrets war.  *Id.* at 497.

[14]   For one thing, like parole officers, private rehabilitation professionals derive their power and right to control potential tortfeasors from public sources (such as court probation orders), or from private contractual arrangements, rather than from parental custody rights.

[15]   Injured miners sued the Mine Safety and Health Administration ("MSHA") under the FTCA for the alleged negligence of federal mine inspectors. The district court granted the MSHA's motion to dismiss the complaint for lack of jurisdiction because the miners' allegations were insufficient to show that Arizona would impose liability upon a private person in similar circumstances.  546 U.S. at 45.  The Ninth Circuit reversed, reasoning that although no private person analogue existed, municipal entities could be held liable.  *Id.*  The Supreme Court vacated that opinion and remanded.  It found that the proper analogue under FTCA is always a private individual, and also that the words "like circumstances" "do not restrict a court's inquiry into the *same circumstances*, but require it to look further afield."  *Id.* at 46 (emphasis in original), *quoting Indian Towing*, *infra*, 350 U.S. at 64.  The Court stated that the Ninth Circuit should have looked to "private persons who conduct safety inspections" for an analogous private person.  Here, private individuals who conduct rehabilitative services is the proper analogy to the federal officers of this case, not grandparents.

[16]   In *Indian Towing*, a barge charterer sued the Coast Guard under the FTCA for negligent operation of a lighthouse, which plaintiffs alleged caused their ship to run aground.  350 U.S. at 62.  The district court dismissed the complaint for lack of subject matter jurisdiction because no private person would be held liable

negligence against federal lighthouse operator analogous to allegations of negligence against private person "who undertakes to warn the public of danger and thereby induces reliance"); *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538, 543 (9th Cir. 1987) (FTCA action "cannot be maintained in the absence of persuasive analogy with private conduct") (citation omitted).  Last, the policy objectives, earlier mentioned, that drive California courts to limit the scope of duty for such private rehabilitation institutions do not apply to grandparents generally.

Plaintiffs' counsel's argument that the California cases cited above for rulings that narrow the scope of the duty of care to identifiable victims are distinguishable because they involved private persons performing "quasi-public functions" fares no better.  First, the words of the FTCA bottom negligence liability "in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  Here, the parole officers' claimed negligence was in failure to control parolee Garrido.  In *Beauchene*, the negligence was in failing to control parolee Bentley; in *Rice*, failure to control the four escaped inmates; in *Cardenas*, the failure to control the resident given a pass; in *Vu*, failure to control Job Corps residents.  In each of these cases, the defendant was in circumstances wherein it had some publicly conferred power to control the

---

under like circumstances, and the Fifth Circuit affirmed.  The Supreme Court reversed, and reasoned that a private person "under like circumstances" with the operator of a lighthouse was a person who "undertakes to warn the public of danger and thereby induces reliance [who] must perform his 'good Samaritan' task in a careful manner."  *Id.* at 65–66.  *See also Olson*, 546 U.S. at 47 ("Private individuals, who do not operate lighthouses, nonetheless may create a relationship with third parties that is similar to the relationship between a lighthouse operator and a ship dependent on the lighthouse's beacon.").

movements of the eventual predator(s)—but did not.  The same circumstances obtain in the case of the parole officers here and Garrido.  In *Poncher*, the grandparents were not acting in a quasi-public function.  Their power to control the grandchild derived from rights of parental custody.  That fact in itself shows again that the parole officers of this case were not in "like circumstances" to the grandparents.

Additionally, the defendant corporations in *Beauchene*, *Rice*, *Cardenas*, and *Vu* were private persons regardless of the fact that they contracted with the government for performance of their tasks.  *See Minneci v. Pollard*, 132 S. Ct. 617, 623 (2012) (private individuals who contracted with Federal authorities to run a private prison were not subject to *Bivens* action).  The tasks that such private rehabilitation professionals perform have never entitled them to official immunity under the California Code provisions that protect public parole services.  *See, e.g.*, Cal. Gov. Code § 845.8.  Nevertheless, *Beauchene* held that private rehabilitation entities have no duty to the general public for the same public policy reasons for which the California legislature immunizes its public institutions: apprehension that such liability would "encourage the detention of prisoners in disregard of their rights and society's needs" and would "deter the development of innovative criminal offender release and rehabilitation programs."  88 Cal. App. 3d at 348.

Moreover, *Beauchene*, *Cardenas*, and *Rice* held that private persons with the ability to control criminals do not owe a duty of reasonable care to persons other than those specifically identified as probable victims based on facts known to defendants.  The holdings of those cases were based on California's public policy that attaches no liability to the decisions of parole officers and others similarly situated.  These policy considerations at first glance would not seem to support

protection from liability for violations of *mandatory* duties; after all, it should be public policy to enforce mandatory rules.  Not so: even where the custodians allegedly violated *mandatory* directives, and the violations allegedly led to the crimes—*Rice*, *Vu*—so strong is the repeatedly mentioned California policy in favor of rehabilitation and against incarceration adopted to protect the custodian from liability, that these cases limit the application of the Restatement § 319 duty to control another where the tortfeasor is subject to rehabilitative parole and detention to specific, identifiable, and foreseeable victims, and not to the general public.

California's decisions restrictive of the scope of the duty of care may seem to some as the judicial enactment of an immunity for custodians, rehabilitation professionals, and parole officers; an enactment that might better be left to a legislature under our principles of separation of powers.  *See Vu*, 706 F.2d at 1033 (Rothstein, J, concurring).  In *Vu*, Judge Rothstein recognized that, because of *Thompson*, the raped wife and her husband were not "foreseeable victims as a matter of law."  *Id.*  But, as Judge Rothstein saw, she had to follow California tort law, as this court must do now.  *See id.* at 1031 (Rothstein, J., concurring) ("I join the majority because I believe the result is required by the holding of the California Supreme Court in *Thompson* . . . . I take issue not with the majority opinion but with *Thompson*, which enunciates a myopic view of foreseeability in the context of the duty to warn and to supervise.").

Here, it is neither alleged for purposes of 12(b)(1) or 12(c), nor is there any evidence from which a reasonable factfinder could conclude under Rule 56, that Plaintiffs were specifically identifiable or foreseeable to the parole officers as potential victims of Garrido of the kind, for example, as the foster mother in

*Johnson* or the named victim in *Tarasoff*.[17]  Rather, the Plaintiffs are more like the general public victims to whom no duty was owed in  *Rice* or *Beauchene* or *Vu*. As such, the United States owed no duty of reasonable care to Plaintiffs in this case.


c.  Conclusion.

A California court, applying California tort law to this case,  would determine that private persons who provide rehabilitation services to criminal offenders owe no duty of reasonable care to members of the general public to warn of, or to control, any dangerous offenders.  Rather, that duty of care is owed only to victims who are specifically identifiable in advance of injury.

Plaintiff Jaycee Dugard was not specifically identified to defendants as a foreseeable victim of Garrido before her kidnapping.  She was a member of the general public.

Defendant  parole officers are in like circumstances to such private

---

[17]  The only reference in the record that even comes close is the direction by parole officer Houston Antwine that Garrido not travel to Lake Tahoe, where the kidnapping later occurred.  But Officer Antwine was clearly concerned *only* about the specifically identified former victim of Garrido's first rape, who lived in Lake Tahoe.  The victim called federal officers on November 18, 1988 and stated she thought (wrongly, as it turned out) that she saw Garrido outside of her work place and expressed fear that Garrido would find and harm her.  ECF 107 Ex. J, "Classification and Initial Supervision Plan," dated 8/10/89, ("No travel is allowed to Nevada, the cite [*sic*] of the crime victim is still in the area."); ECF 120 Ex. K at 661 (record of victim's phone call to parole officers and her fears).  And at any rate, the general public of South Lake Tahoe, even the young girls of South Lake Tahoe, are more general classes than, for example, the unforeseeable neighborhood children of *Brenneman* or *Thompson*.

rehabilitation services providers to criminal offenders.  Hence, under the FTCA's application of California law, they are not liable to Plaintiffs.

The court recognizes that Plaintiffs' stated injuries are certainly as painful as those suffered by the unfortunate victims in *Thompson*, *Hooks*, *McDowell*, *Brenneman*, *Rice*, *Beauchene*, *Cardenas*, and *Vu.*  But this court has no authority to re-write California law.  Because private defendants in like circumstances with defendant parole officers would owe no duty to Plaintiffs in California, this court GRANTS the government's motion to dismiss for lack of subject matter jurisdiction and DISMISSES this action.

This court now turns to the other government motions.


## II.  The discretionary function exception of the FTCA does not bar Plaintiffs' claims.

### a.  Legal standards.

28 U.S.C. § 2680(a) limits the United States' waiver of sovereign immunity under the FTCA by its bar of a tort claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government."  This is known as the "discretionary function exception" to the FTCA.  Its purpose is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. Varig Airline*s, 467 U.S. 797, 814 (1984).   Because the exception protects *discretionary* decisions, however, it will not apply when a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  The

government bears the burden of proving that the exception applies.  *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002).

The government argues that its parole officers violated no *mandatory* duties, which violations proximately caused Plaintiffs' claimed injuries.  At worst, the government argues, only its parole officers' discretionary decisions went awry; thus, the discretionary function exception applies and bars this suit.  For that reason, the government moves per Fed. R. Civ. P. 12(b)(1) to dismiss the Plaintiffs' complaint for lack of subject matter jurisdiction.  *See Berkovitz*, 486 U.S. at 533–34.  This jurisdictional argument was a subject of this court's Order of April 4, 2012, ECF 23.  This court ruled that the discretionary function exception did not apply because, assuming Plaintiffs' allegations to be true, the Plaintiffs had alleged the existence of mandatory duties, the breach of which caused Plaintiffs' harm.  ECF 23 at 13–14.  The government now asserts that, after discovery, Plaintiffs have not adduced any *factual* evidence of any mandatory directives that government parole officers violated, which violations proximately caused harm to plaintiffs.

A 12(b)(1) jurisdictional attack may be facial or factual.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A factual attack based on evidence disputes the truth of allegations that give rise to federal jurisdiction.  *Id.*  The court need not assume the truthfulness of the plaintiff's allegations.  *Id.*


b.  Mandatory duties existed.

Here, Plaintiffs have adduced sufficient evidence of mandatory duties to survive the government's jurisdictional challenge.  Six mandatory policies, procedures, or duties establish the basis for Plaintiffs' claims for purposes of Rules

12(b)(1) and 56 without any hindrance from the discretionary function exception.

First, federal parole officers were required to make monthly personal contact with Garrido, as directed by policy and procedure manuals published by the United States Parole Commission.  Publication 106 ("The Supervision Process") of the Administrative Office of the U.S. Courts stated that "Minimum personal contact rates have been established for each level of supervision to address the statutory responsibility to keep informed of  the conduct and condition of offenders."  ECF 107 Ex. A, at 4.  Garrido's "Classification and Initial Supervision Plan" dated August 10, 1989, listed his "Supervision level" was "High" and set his client contact at "monthly."  ECF 107 Ex. R.  There is sufficient evidence in the record that personal contact did not occur monthly.[18]

Second, the U.S. Parole Commission's 1989 Rules & Procedures Manual (the "Manual"), ECF 120 Ex. J, codified at 28 C.F.R. § 2.1 *et seq*., required that "[a] supervision report shall be submitted by the responsible probation officer to the [Parole] Commission for each parolee after the completion of 24 months of continuous supervision and annually thereafter."  Manual, § 2.42, ECF Ex. J at 518.  There is evidence in the record from which a fact finder could conclude that this report was filed in January 1991 and covered the period between December 1988 and December 1990, but that the report did not conform to Parole Commission directives that reports of parole violations were to be included.  *See infra* Section IV (c).

---

[18]  Parole officers recorded personal contacts on 8/30/88, 9/7/88, 10/24/88, 12/19/88, 12/24/88, 2/24/89, 3/28/89, 6/13/89, 6/20/89, 8/10/89, 8/14/89, 8/16/89, 8/23/89, 9/3/89, 9/13/89, 9/20/89, 12/1/89, 2/5/90, 2/9/90, 3/2/90, and 7/10/90. ECF 120 Ex. K.

Third, §§ 2.40-13(c)(1) and (c)(2) of the Manual[19] stated that:

(c)(1) The Commission's policy is one of "zero tolerance" regarding illegal drug use by parolees. Probation officers shall advise each parolee that even the first such illegal use is subject to and will result in intervention/sanction.

(2) Any instance of illegal drug use by any parolee shall be reported by the probation officer to the Commission. The probation officer shall also report the intervention/sanction imposed by the probation officer for such drug usage and/or the intervention/sanction which the probation officer recommends be imposed by the Commission.

There is evidence in the record that Garrido repeatedly used drugs while on parole and also that these instances were not reported to the Parole Commission.[20]

Fourth, § 2.42-02(b)(4) of the Manual stated that:

(b) The Parole Commission delegates to the probation officers the authority to exercise discretion as to when technical violations or infractions are reported except that all violations shall be reported immediately under the following circumstances:

(4) The releasee fails to submit monthly reports for 2 consecutive months even though his whereabouts are known to the probation officer.

---

[19] The government argues that because these sections are "notes and procedures" of the Manual, they are not mandatory. This argument is unavailing. *See Coleman v. Perrill*, 845 F.2d 876, 879 (9th Cir. 1988) ("merely precatory" language in the Manual's "notes and procedures" stating that an act should be performed "where feasible" was discretionary; had the language been mandatory, the note and procedure would have been "among [the Manual's] requirements").

[20] There is sufficient evidence from which a reasonable factfinder could conclude that parole officers knew of Garrido's drug use on 7/18/89, 9/22/89, 9/25/89, 10/2/89, 10/9/89, 10/12/89, 10/13/89, 11/9/89, 11/14/89, 11/17/89, and 8/6/90, but did not report the violations to the commission. ECF 120 at 13 and references therein; ECF 120 Ex. S no. 68. *See also* ECF 120 Ex. H (Deposition of Stephen Husk) at 214:4–7 ("Q. And we have—this file is littered with parole violations that were never reported to the Commission, correct? A. Correct.").

There is evidence in the record that Garrido failed to submit successive monthly reports in October and November 1990.[21]

Fifth, § 2.42-02(b)(9) required reporting to the Parole Commission when a releasee committed "violations of any special condition of parole or mandatory release." There is evidence in the record that Garrido violated the special conditions of his release that he not drink alcohol to excess,[22] and that he appear for drug testing and counseling.[23]

Sixth, there is sufficient evidence that there existed a mandatory duty to report incidents of "flushing"—that is, submitting watered-down urine specimens at a drug test to avoid a positive indication of drug use—as part of the mandatory duty to report drug violations. ECF 120 Ex. T (parole publication directed that submissions of diluted urine were "episodes" that required reporting); ECF 120 Ex. H (Deposition of Stephen Husk) at 82:23-25 (considering flushing a possible violation that required reporting). There is evidence in the record that Garrido had

---

[21]   ECF 120 Ex. DD ("Case Review Worksheet" dated December 5, 1990).

[22]   ECF 120 Ex. L at 051873 (Garrido had "enormously high" blood alcohol positive test on 7/9/90 ); ECF 120 Ex. K at 650, 7/19/90 entry (report of same incident; Garrido had "dangerously high" Blood Alcohol Content of .45).

[23]   ECF 120 Ex. F (Deposition of Katherine Izmail) at 125:23–126:6 ("no-show for drug testing [is] a violation of the drug aftercare special condition of parole" that required "immediate reporting"); ECF 120 Ex. H (Deposition of Stephen Husk) at 104:6–12 ("no-show for counseling [constitutes] a violation of his parole"). There is evidence that Garrido missed drug testing on 10/20/89 and 11/30/90, and missed six counseling sessions between August and November, 1989, four between July and October 4, 1990, and two more before January 1991. ECF 120 at 13. The government's alleged negligence during these periods is basis for Plaintiffs' claims. *See* Section IV, *infra*.

multiple incidents of "flushing."[24]

Two duties that Plaintiffs have claimed in their briefs were "mandatory," however, are discretionary, and claims based upon them must be dismissed.[25] Manual § 2.42-02(c) provides that "Violations of the conditions of parole or mandatory release shall be reported immediately to the Parole Commission *if, in the opinion of the Probation Officer*, the violation behavior is part of a continuing pattern of infractions . . . ." (emphasis added). Manual § 2.42-02(b)(6) requires reporting when "[t]he releasee has purchased, possessed, or administered a controlled substance under circumstances which *lead the probation officer to believe* the releasee is abusing controlled substances on *an on-going basis* . . . ." (emphasis added).

Both of these sections contain language that places the decision to report

---

[24]  There is sufficient evidence from which a reasonable factfinder could conclude that parole officers were aware that Garrido "flushed" on 8/21/89, 9/5/89, 10/12/89, 1/19/90, 2/26/90, 7/5/90, 7/20/90, 7/26/90, 8/16/90, 8/20/90, 9/6/90, 9/10/90, 9/20/90, and 10/4/90, but did not report the incidents of "flushing" to the Parole Commission.  *See* ECF 120 at 13 and references therein; ECF 120 Ex. H (Deposition of Stephen Husk) at 214:4–7

[25]  Additionally, Plaintiffs in SAC ¶ 56 made reference to mandatory directives in a publication entitled Monograph 109, *The Supervision of Federal Offenders*.  But any alleged violations of those directives occurred in 1993, after the kidnapping.  Plaintiffs limit their claims to breaches of mandatory duties that caused Jaycee Dugard's kidnapping in 1991; they eschew any claims that other violations, after that date, prolonged her captivity or the conditions of Plaintiffs' captivity.  Because violations of those directives cannot be the cause of Plaintiffs' claimed damages, the government's motion for summary judgment is GRANTED as to any such claims based on Monograph 109.  At any rate, Plaintiffs made no reference to Monograph 109 in any of their opposition documents, and appear to concede this point.

31

within the discretion of the officer, based on his opinions or beliefs.  *See Coleman*,

845 F.2d at 879 (because the language of the Parole Manual in a disputed section

said that the officers should act "where feasible," "[a]ny decision to follow these

[Manual] guidelines is therefore properly within the Commission's discretion, and

the exercise of that discretion is not reviewable by this court").  Nevertheless, as

detailed above, Plaintiffs have adduced sufficient evidence of breach of each of the

six mandatory duties listed above upon which Plaintiffs' jurisdictional claim can be

based.[26]

---

[26]  The government attempts to renew its argument—rejected in this court's
Order of April 4, 2012, ECF 23—that the discretionary function exception applies
to this case as a matter of law.  The government argues that the recent case of
*Dichter-Mad Family Partners v. United States*, 709 F.3d 749 (9th Cir. 2013),
*adopting the holding of Dichter-Mad Family Partners v. United States*, 707 F.
Supp. 2d 1016 (C.D. Cal. 2010), "now controls."  It does not.  In *Dichter-Mad*,
defrauded plaintiffs sued the United States for negligence in the SEC's
investigation of the Bernie Madoff Ponzi scheme.  The plaintiffs alleged that,
despite numerous opportunities during its investigations of Madoff, the SEC
negligently failed to uncover multiple obvious indications that Madoff was
defrauding investors.  The district court granted the government's motion to
dismiss on the discretionary function exception because the 1934 Securities and
Exchange Act expressly gave the SEC discretion as to whether, when, and how to
conduct its investigations and enforcement actions.  Plaintiffs, moreover, could
point to only three "mandatory" duties the SEC allegedly violated.  This "small
handful" of obligations did not overcome the discretionary exception, particularly
because the violations of the three "mandatory" duties were "unrelated" to the
ultimate injuries.  707 F. Supp. 2d at 1049, 1050.  The Ninth Circuit affirmed and
adopted the district court's decision as its own opinion.
      Here, the mandatory reporting duties alleged of the parole officers are
related directly to the damages Plaintiffs seek.  *See infra* Section IV.  Most
important, no act of discretion in this case was possible precisely *because* the
officers never reported violations to the Parole Commission.  And as explained in
Section IV, *infra*, if the officers had reported Garrido's violations, "very little
[would have] intervened" between the parole officers' reports and the

c. The mandatory duties were not "subject to policy considerations."

The discretionary function exception applies when 1) a statute, regulation, or policy confers discretion on the government actor, or 2) the actor's course of action is "susceptible to policy analysis." *Dichter-Mad*, 707 F. Supp. 2d at 1029, *adopted by* 709 F.3d 749 (9th Cir. 2013), *citing United States v. Gaubert*, 499 U.S. 315, 323, 325 (1991).  The government proposes that the parole officers' conduct in this case was "dependent on myriad discretionary acts grounded in often competing policy considerations, and thus does not lend itself to static rules."  ECF 107 at 20.

Plaintiffs have the better argument.  The Ninth Circuit in *Whisnant v. United States* held:

> [A] dominant theme in our case law is the need to distinguish between design and implementation: we have generally held that *the design of a course of governmental action is shielded by the discretionary function exception, whereas the implementation of that course of action is not.*

400 F.3d 1177, 1181 (9th Cir. 2005) (emphasis added).  In *Whisnant*, plaintiff sued the Defense Commissary Agency for an illness he attributed to the accumulation of toxic mold at his workplace.  The Ninth Circuit held that the government's duty to maintain healthy facilities was "not a policy choice of the type the discretionary function exception shields."  *Id.* at 1183.  The policy choice for healthy workplaces

_____

commencement of revocation proceedings.  *General Dynamics Corp. v. United States*, 139 F.3d 1280, 1284, 1285 (1998), *explaining In re Glacier Bay*, 71 F.3d 1447 (9th Cir. 1995).  Instead, the proffered evidence, in the light most favorable to the Plaintiffs, shows "tight coupling" between the parole officers' actions and those of the Parole Commission, and that no "totally separate exercise" of "independent . . . in every sense of the word" "broad-based" and "robust" discretion would have intervened between the officers' reports and the Parole Commission's actions.  *Id.*  at 1284, 1285.

had already been made; its implementation was not discretionary.  So too here: the Parole Commission had a "zero tolerance" drug policy that was already decided by Congress.[27]  Its implementation, as spelled out in the Parole Commission publications, was mandatory.  Thus, the duties of the officers to report the releasee Garrido's violations to the Parole Commission were not "subject to policy analysis."

### d.  Conclusion.

In sum, the federal officers of this case were required to perform six mandatory duties, including a duty to report illegal drug use by parolees to the Parole Commission.  As described in Section IV at footnote 34 *infra*, moreover, there is sufficient evidence from which a reasonable factfinder could conclude that a report of Garrido's drug use to the Parole Commission pursuant to those mandatory duties would, more likely than not, result in a decision to revoke Garrido's probation and reincarcerate him.  Such a decision would not have been dependent on a further act of discretion "independent in every sense of the word," *General Dynamics*, 139 F.3d at 1285, but rather would have been "tight[ly] coupl[ed]" to the reports of the parole officers.  *Id*.  These mandatory duties were also not "susceptible to policy analysis."  The discretionary function exception thus

---

[27] ECF 120 Ex. D (Deposition of Dr. Carol Getty) at 84:12-19:

[T]here had been an environment in the early 1980s when I first got on the Commission of treating [drug use].  That we treated people who were—had been released on parole.  We gave them chances.  With the environment and the way Congress—the laws Congress passed, we had to do a zero tolerance.  And so that's what happened.

does not apply to these duties.  Two duties that Plaintiffs have claimed were mandatory, however, involved officer discretion, and the discretionary function exception bars suit based on these alleged failures.

For these reasons, the government's motion to dismiss for lack of subject matter jurisdiction is GRANTED as to 1) any claims based on failure to perform the duties described in Manual § 2.42-02(c) ("Violations of the conditions of parole or mandatory release shall be reported immediately to the Parole Commission if, in the opinion of the Probation Officer, the violation behavior is part of a continuing pattern of infractions . . . ."), and 2) any claims based on duties described in Manual § 2.42-02(b)(6) ("[t]he releasee has purchased, possessed, or administered a controlled substance under circumstances which lead the probation officer to believe the releasee is abusing controlled substances on an on-going basis . . . .").

The government's motion to dismiss for lack of subject matter jurisdiction is DENIED as to the other six duties listed above.


## III.  The United States parole officers are not cloaked in absolute judicial immunity.

Under the FTCA, the United States is "entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim." 28 U.S.C. § 2674.  The Ninth Circuit has held that parole officers are entitled to absolute quasi-judicial immunity when performing "actions integral to [parole] decisions."  *Swift v. California*, 384 F.3d 1184, 1191 (9th Cir. 2004).  The government moves to dismiss Plaintiffs' claims on the ground that absolute judicial

immunity applies.  It argues, essentially, that *every* action or inaction the parole officers took in this case was "integral" to parole decisions, and thus was immunized absolutely.

In *Swift*, however, the Ninth Circuit specifically rejected parole officers' arguments that they had absolute immunity for all actions that "*relate to* the decision to grant, deny, or revoke parole."  *Id.* at 1191 (emphasis added).  Rather, the correct test for the application of judicial immunity is whether an official is "performing a duty functionally comparable to one for which officials were rendered immune at common law," such as that of a judge.  *Id.* at 1190.  In *Swift*, parole officers were *not* immunized when "performing investigatory or administrative functions, or [when] essentially functioning as a police officer or detective."  *Id.* at 1191.  Such non-immunized investigatory or administrative functions specifically included conduct "arising from [parole officers'] duty to supervise parolees."  *Id.*, *citing Anderson v. Boyd*, 714 F.2d 906 (1983).  These duties included a directive that parole officers "'shall report to the board any parolee who is reasonably believed to' have committed certain enumerated violations," which included drug distribution.  *Id.* at 1192, *quoting* Cal. Code Regs. tit. 15, § 2616(a).  Only *after* a report was made did the California Board of Prison Terms have "discretion to initiate the revocation proceedings."  *Id.*  Thus, the court reasoned, the board, and not the officers, played the "quasi-judicial role."  *Id.*, *discussing Scotto v. Almenas*, 143 F.3d 105, 112 (2d Cir. 1998) (same, under New York law).  The parole officers' actions and omissions "were more akin to a police officer seeking an arrest warrant, than to a prosecutor exercising quasi-judicial discretion to initiate criminal proceedings."  *Id.* at 1193.  As such, the officers were not entitled to absolute immunity in the federal suit for their conduct while: (1) investigating parole violations, (2) ordering the "issuance of a parole hold and

36

orchestrating the parolee's arrest," or (3) "recommending the initiation of parole revocation proceedings." *Id.* at 1191.

These activities are precisely the kinds of duties the parole officers in this case are claimed to have breached by omission. As such, the parole officers are not entitled to absolute judicial immunity, and the government's motion to dismiss for absolute immunity is DENIED.

## IV.  There is sufficient evidence for a reasonable factfinder to hold in favor of Plaintiffs on proximate cause.

The government moves for summary judgment on the ground that there is insufficient evidence for a reasonable factfinder to determine that the parole officers' alleged failure to report Garrido's drug violations to the Parole Commission was a substantial factor that proximately caused Plaintiffs' harm. A party is entitled to summary judgment when, viewing the evidence after discovery in the light most favorable to the non-moving party, the evidence "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. " *Id.*; *King Cnty. v. Rasmussen*, 299 F.3d 1077, 1083 (9th Cir. 2002). Whether the claimed negligence caused the claimed damages is a material fact issue.

Where the nonmoving party (here, Plaintiffs) will bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Coverdell v. Dep't of Social and Health Servs.*, 834 F.2d 758, 769 (9th Cir. 1987). The burden then shifts to the nonmoving party to identify "specific facts showing that there is a genuine issue for trial." *Id.* "The

non-moving party must show more than the mere existence of a scintilla of evidence," and must "come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *In re Oracle Corp.*, 627 F.3d 376, 387 (9th Cir. 2010).

The Plaintiffs' First Claim for Relief focuses entirely on alleged breaches of duty that preceded and allegedly caused Jaycee Dugard's kidnapping.[28] As stated in Section II above, the breaches of mandatory duties upon which Plaintiffs rely are the failures of the parole officers to report to the Parole Commission parole violations such as Garrido's positive drug and alcohol tests, his admissions of drug use, and incidents of flushing.[29] Plaintiffs assert that if these had been reported, it

---

[28] Plaintiffs do not claim any breaches of duties that took place after Jaycee Dugard's kidnapping that caused her captivity to continue, or affected the conditions thereof, at times after the kidnapping.

[29] The second mandatory duty described above was the directive in Publication 106 and in the Supervision Plan that "High Activity" parolees like Garrido have monthly contact with the officers. ECF 107 Ex. A, at 4; ECF 107 Ex. R. This duty thus survived the jurisdictional motion to dismiss. On summary judgment, however, there is no evidence that would explain how a failure to perform this duty every month was the cause of Plaintiffs' injury. Parole officers reported personal contacts with Garrido on 8/30/88, 9/7/88, 10/24/88, 12/19/88, 12/24/88, 2/24/89, 3/28/89, 6/13/89, 6/20/89, 8/10/89, 8/14/89, 8/16/89, 8/23/89, 9/3/89, 9/13/89, 9/20/89, 12/1/89, 2/5/90, 2/9/90, 3/2/90, and 7/10/90. ECF 120 Ex. K. Plaintiffs have not produced even a scintilla of evidence by which a reasonable factfinder could find that, had a full schedule of monthly contacts occurred, Garrido would have been unable to kidnap Jaycee Dugard. This allegation in short appears not to be causative in any way. Indeed, Plaintiffs do not mention this duty in the section of their Opposition to the government's motions where they assert the mandatory duties they claim are at issue. ECF 120 at 6–18. For this reason, this court GRANTS the government's motion for summary judgment as to allegations based on failure to perform the monthly contact duty.

would have resulted in Garrido's parole revocation and reincarceration, and thus his inability to kidnap Jaycee Dugard on June 10, 1991. The government responds that even if the Commission had revoked Garrido's parole in either September, October, or November 1989 after drug-positive tests around those dates, there is no evidence that he would still have been incarcerated on June 10, 1991. Both parties agree that, under the Parole Commission guidelines in force at the time, if Garrido's parole had been revoked for his drug use, the guidelines would have placed him in prison for eight to twelve months.

At oral argument, Plaintiffs' counsel suggested three points in time when Garrido's drug violations would have caused his parole to be revoked. First, November 1989, by which point Garrido had failed ten drug tests, admitted drug use, diluted three urine samples, and failed to appear for counseling eleven times. *See* ECF 120 at 13 and record citations therein. Second, from July to October 1990, during which time Garrido failed two drug tests, tested positive for high alcohol intake, diluted nine urine samples, and failed to appear for counseling five times. *Id.* Third, January 1991, when the parole officers submitted a Supervision Report to the Parole Commission that covered Garrido's activities from December 16, 1988 to December 1990, but that made no mention of Garrido's violations except to say that he "had some problems early on with opportunistic drug use." ECF 107 Ex. I. The court addresses each in turn to determine whether, under Fed. R. Civ. Pro. 56, sufficient evidence about each point in time has been adduced to

Similarly, no evidence supports any theory of causation based on Plaintiffs' allegations in the SAC ¶ 56(d) that the officers failed to complete an initial supervision plan for Garrido for eight months, as opposed to within thirty days as required. To the extent that Plaintiffs still pursue this theory, which was not developed in their briefs, the government's motion for summary judgment is GRANTED for any claim based on failure to prepare this initial supervision plan.

support Plaintiffs' claims.

a.  November 1989.

Had Garrido received parole revocation with consequent incarceration for violations that occurred in or around November 1989, and received even the upper end of the revocation guidelines, he would have been freed from prison by the winter of 1990–1991.  He thus would have been able to kidnap Jaycee Dugard in June, 1991.  Plaintiffs insist, however, that, given Garrido's record by November 1989, he would have been re-incarcerated for a period in excess of the guidelines. They base their claim on three statements.  First, the declaration of Plaintiffs' witness and former parole officer Robert Storey that "it is likely that [Garrido] would not have been eligible for reparole for a much longer period of time" than the twelve month upper guideline.  ECF 103 Ex. A (Storey Report) at 16.  Second, Storey's assertion that the Western Region of the United States Parole Commission exceeded the guidelines in 1989 and 1990 up to 10% of the time.  *Id.*  Third, the testimony of defense witness Stephen Husk, who stated that during his tenure as a parole officer the guidelines could be exceeded by as much as ten times.[30]  ECF 120 Ex. H (Deposition of Stephen Husk) at 280:1–8.[31]

---

[30]  At oral argument, counsel for Plaintiff attempted to analogize Garrido's case to the revocation hearing of one McCallum in which Husk had been involved. McCallum had his parole revoked for ten years.  The record, however, does not explain *why* the guidelines were so exceeded in McCallum's case such that a reasonable finder of fact could draw any analogies to this case.  ECF 120 Ex. H (Deposition of Stephen Husk) at 286–87.

[31]  Husk also testified in deposition that it was a "possibility" that Garrido could have been revoked for an amount of time in excess of the parole revocation

All of these statements, however, are assertions of mere possibility—a "scintilla" of "colorable" argument. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Without more, these statements give no evidentiary indication of *why* or *whether* Garrido would have been among the 10%, much less for how much longer than the guidelines he would have been reincarcerated, or why.  The evidence is therefore insufficient to allow a reasonable factfinder to come to the conclusion that, had Garrido's parole been revoked in the fall of 1989, he would have served a prison term of at least year and a half, such that he would not have been free to kidnap Jaycee Dugard on June 10, 1991.[32]

Plaintiffs, in short, have not provided record citations of evidence as asked of them, ECF 129, from which a factfinder could conclude that it was more probable than not that reporting and revocation in 1989 would have kept Garrido from injuring them in 1991 or thereafter.  As such, this court GRANTS the government's motion for summary judgment for claims arising from any alleged

---

guidelines.  *Id.* at 297:5–18.

[32]  Robert Storey also asserted that Garrido would not have kidnapped Jaycee Dugard even if he had been released prior to June 1991 because, essentially, Garrido would have been chastened and "toe[d] the line" after his reparole.  ECF 103 Ex. A (Storey Report) at 17.  While the Court in this Order assumes that Mr. Storey is capable of testifying as an expert to the general practices of parole officers and of the Parole Commission by virtue of his long experience as a parole officer, the court does not consider Mr. Storey capable of giving the speculative behavioral psychological opinion as to how Garrido would act.  *See Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) ("Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs.").

failed duties preceding and through November, 1989.

### b.  July 5, 1990–October 4, 1990.

During this period Garrido failed two drug tests, diluted nine urine samples, and failed to appear for counseling four times.  ECF 120 at 13.  Garrido also failed to submit monthly reports to his parole officer as required, which failures the officers did not report to the Parole Commission.  ECF 120 Ex. DD.  These infractions were in addition to the previous incidents that had occurred in the fall of 1989.  *See* ECF 120 at 13.  Robert Storey declared that "Garrido's level of 'uncooperativeness' [was] blatant" and that by "late 1990 it is unquestionable that a probation officer would have been recommending a warrant for Garrido's arrest." ECF 103 Ex. A (Storey Report) at 10.  There is thus sufficient evidence for a trier of fact to be able to find, more likely than not, that Garrido would have been arrested in October 1990 had the parole officers reported the violations to the commission.

There is also sufficient evidence for a reasonable factfinder to conclude that the following chain of causation would have eventuated: 1) A parole officer would have reported the violations to the Parole Commission with a recommendation that warrant issue: "by late 1990 it is unquestionable that a probation officer would have been recommending a warrant for Garrido's arrest."  ECF 103 Ex. A (Storey Report) at 10; ECF 120 Ex. H (Deposition of Stephen Husk) at 237:6–9 ("Q.  It is likely that you would have recommended to the Commission that his parole be revoked, correct?  A. That it be—a warrant be issued.").

A reasonable factfinder could also conclude that the Commission 2) would have granted the warrant upon such a recommendation after drug violations

occurred.  ECF 120 Ex. D (Deposition of Carol Getty) at 109:11–18 ("[I]f I had been the informed U.S. Parole Commissioner, I would have issued a warrant for Garrido's arrest and begun the revocation process at the first signs of a watered urine specimen, positive drug test, or evidence of self medication."); ECF 103 Ex. A (Storey Report) at 10 ("It is also my opinion that a warrant would have issued with the request.").  There is also sufficient evidence from which a factfinder could conclude that a parole officer and the responsible Regional Commissioner 3) would have found probable cause of a violation based upon Garrido's failed drug and alcohol tests on July 9, 1990 or August 6, 1990, or upon the nine flushing incidents between July and October 1990—or at least upon Garrido's actual admission to his counselor in August, 1990 that he had used methamphetamines. ECF 120 Ex. L at 688.

Furthermore, there is sufficient evidence that the Commission then 4) would have opened revocation proceedings.  ECF 103 Ex. A (Storey Report) at 12:3–4 ("If following the probable cause hearing, the official's recommendation is that probable cause may be found and the Regional Commissioner agrees, the parolee appears before the Commission at a revocation hearing to determine whether a violation had occurred.").

Given Garrido's admissions, positive drug tests, and flushing, a rational factfinder could also conclude that, at a hearing that would have occurred in or around the fall or early winter of 1990, the hearing examiner 5) would have found a violation by preponderance of the evidence.  And there is sufficient evidence for a factfinder to conclude that the hearing examiner 6) would have recommended to the Commission that the parole be revoked.  *See* ECF 120 Ex. H (Deposition of

Stephen Husk) 237:10–239:8.[33]

There is also enough evidence for a factfinder to determine as more likely than not that 7) the Commission would have found evidence of a violation by the preponderance of evidence, taken the recommendation of the hearing examiner, revoked parole, and ordered incarceration, and that the Regional Commissioner 8) would have upheld that decision so to revoke Garrido's parole:

> The hearing examiner reviews the violation charges with the parolee [and] apprises the parolee of the evidence which has been presented to the Commission and receives the statements of witnesses and documentary evidence. The Commission need only find that a violation is shown by a preponderance of the evidence. At the conclusion of the hearing, the examiner informs the parolee of the recommended decision as to whether parole should be revoked. The examiner's decision is then communicated to the Regional Commissioner, who has the authority to accept or deny the panel's recommendation. In my experience as Regional Commissioner, it was the case at least 95% of the time that the recommendation of the panel was accepted. In the small minority of cases in which the panel's recommendation was not accepted, it was typically the case that a harsher sentence was imposed on the parole violator rather than a more lenient one.

ECF 120 Ex. D (Deposition of Carol Getty) at 100:12–17; 183–84. Additionally, parolees who were released after December 31, 1988 had their parole *automatically* revoked if they were found to have been in possession of controlled substances. Garrido was released before that date, but Stephen Husk testified that

---

[33]  Husk at that point in his deposition was speaking about a hypothetical revocation hearing that would taken place after Garrido's numerous drug infractions and admissions of drug use that occurred in fall 1989. This court can fairly infer, however, that, combining the 1989 infractions with the failed tests and episodes between July and October 1990, Husk's testimony on revocation is applicable to 1990 if the first revocation hearing had occurred then. *Addisu*, 198 F.3d at 1134 ("Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party.").

the outcome would have been the same for Garrido:

> Q. Yeah.  So let's get the testimony clear.  If you found possession at a revocation hearing, whether the parolee had been released December 31, 1988 or January 1, 1989, if you found possession in the revocation hearing, you would follow the guideline in 2.40K mandatory revocation; correct?

> A. Yes.

ECF 120 Ex. H (Deposition of Stephen Husk) at 133:15–22.[34]  Dr. Getty also testified that there was a "presumption of revocation" for drug offenses, regardless of release date.  ECF 120 Ex. D (Deposition of Carol Getty) at 121:15–18; Ex. D at 156, 187.  Thus, there is sufficient evidence from which a factfinder could conclude that the Commission panel would have revoked parole and that the Regional Commissioner would have accepted that decision.  Because the guidelines, as both parties agree, were for a minimum of eight months, there is sufficient evidence that, had Garrido had his parole revoked in late 1990, he still would have been imprisoned on June 10, 1991 and Jaycee Dugard would not have been kidnapped in South Lake Tahoe that day.

The Plaintiffs have therefore shown enough evidence from which a reasonable finder of fact could conclude that the officers' breaches of mandatory duties regarding the reporting of drug and other violations was a substantial factor in Garrido's ability to kidnap Jaycee Dugard.  *Bockrath v. Aldrich Chem. Co., Inc.*,

---

[34]  This testimony and that of Dr. Getty about the Regional Commissioner's 95% acceptance of the Parole Commission panels' recommendation is, in the light most favorable to the Plaintiffs, sufficient evidence from which a reasonable factfinder could conclude that the Parole Commission engaged in no "robust" exercise of discretion "independent in every sense of the word" from the reports of the parole officers such that the discretionary function exception of the FTCA does not apply.  *See General Dynamics*, 139 F.3d at 1284, 1285.

21 Cal. 4th 71, 79 (1999) ("The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical.").  The government's motion for summary judgment is thus DENIED for allegations based on alleged failures to report in the fall of 1990.


    c.  January 1991.

      As stated above, the U.S. Parole Commission's 1989 Rules & Procedures Manual (the "Manual"), ECF 120 Ex. J, codified at 28 C.F.R. § 2.1 *et seq*., required that "[a] supervision report shall be submitted by the responsible probation officer to the [Parole] Commission for each parolee after the completion of 24 months of continuous supervision and annually thereafter."  Manual, § 2.42. The notes and procedures to § 2.42 conclude: "All violations not reported immediately shall be reported on the Supervision Progress Report (Parole Form F-3)."  In January 1991, parole officers submitted an F-3 Supervision Report to the Parole Commission that covered Garrido's activities from December 16, 1988 to December, 1990.  This report made no mention of parole violations except to say that Garrido "had some problems early on with opportunistic drug use."  ECF 107 Ex. I.

      Thus, there is sufficient evidence for a factfinder to conclude that, even if Garrido's drug violations did not require an immediate report, those violations had to be reported on Form F-3.  Robert Storey, moreover, declared that "if protocol were followed, all of these violations would have been summarized in Garrido's first written supervision report, [and] it is a virtual certainty that Garrido would have been sent back to prison at the very latest following the Commission's receipt of the 24 month supervision report, which was due in December 1990."  ECF 103

Ex. A (Storey Report) at 15.  *See also* ECF 120 Ex. D (Deposition of Carol Getty) at 109:11–18 ("[I]f I had been the informed U.S. Parole Commissioner, I would have issued a warrant for Garrido's arrest and begun the revocation process at the first signs of a watered urine specimen, positive drug test, or evidence of self medication").

In the light most favorable to Plaintiffs, this evidence is sufficient for a reasonable fact finder to conclude that upon receipt in January 1991 of a report that detailed Garrido's drug use, drug test results, and chicanery directed at avoiding detection of drug use ("flushing"), as required, the chain of causation described above in relation to the 1990 events, Section IV (b), would have been triggered, with the ultimate result that Garrido would have had his parole condition revoked and would have been remanded to incarceration for at least the eight to twelve month guideline period—and thus that he would have been in prison on June 10, 1991.  Accordingly, the government's motion for summary judgment on this point is DENIED.


## V.  Plaintiffs' claims are not barred by the FTCA's limitations provision, 28 U.S.C. § 2401(b).

Jaycee Dugard filed her administrative claims on November 5, 2010, a year and three months after her rescue in August, 2009.  28 U.S.C. § 2401(b) provides:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

"As a general rule, a claim accrues 'when a plaintiff knows or has reason to know

of the injury which is the basis of his action'" and when "plaintiffs [know] both the fact of injury and its immediate physical cause." *Hensley v. United States*, 531 F.3d 1052, 1056, 1057 (9th Cir. 2008), *quoting Dyniewicz v. United States*, 742 F.2d 484, 487 (9th Cir. 1984). Moreover, as the government stresses, "ignorance of the involvement of United States employees is irrelevant to determining when" a claim accrues. *Id.*

But even assuming *arguendo*, as the government insists, that Plaintiffs' cause of action here accrued on the date of Jaycee Dugard's kidnapping, the Ninth Circuit's recent decision in *Wong v. Beebe*, — F.3d — (9th Cir., Oct. 9, 2013) has determined that equitable tolling applies to § 2401(b)'s statute of limitation.

"Equitable tolling focuses primarily on the plaintiff's excusable ignorance of the limitations period." *Hensley*, 531 F.3d at 1057, *citing Lehman v. United States*, 154 F.3d 1010, 1016 (9th Cir. 1998). The party invoking tolling need only show that his "ignorance of the limitations period was caused by circumstances beyond the party's control, and that these circumstances go beyond a 'garden variety claim of excusable neglect.'" *Socop-Gonzalez v. INS*, 272 F.3d 1176, 1193 (9th Cir. 2001), *citing Irwin v. Dep't of Veterans' Affairs*, 498 U.S. 89 (1990).

"Garden variety," to say the least, does not describe the Dugards' situation. The proffered evidence need bear only minimal repeating. Jaycee Dugard "had been kidnapped at the age of 11 and made to do unspeakable things and had to depend on these two people [the Garridos] for everything." ECF 120 Ex. E (Deposition of Jaycee Dugard) 207:12–15. She lived in a backyard tent and was not allowed even to say her real name for eighteen years. *Id.* at 84, 89:18–19. She testified in deposition that Garrido threatened to "take away my kids" and with "all the mind games that [he] played, I always felt that he knew things, and I didn't

want to take risks" like checking for her birth mother on the internet. *Id.* at 242:12–13; 243:6–9. She stated that she was "dependen[t]" on the Garridos. *Id.* at 204:25. She said that she was "afraid of [Garrido], and I didn't know what to do." *Id.* at 89:16–17. The mere fact that Jaycee Dugard could leave the house *with the Garridos* to take trips, or had access to Garrido's printing business cell phone, as the government persistently urges, ECF 107 at 69, does not render her ignorance within her control, nor any neglect of FTCA filing deadlines inexcusable.

The Supreme Court has recently reiterated that the "flexibility inherent in equitable procedure enables courts to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices." *Holland v. Florida*, 130 S. Ct. 2549, 2563 (2010) (citations and quotations omitted). Plaintiffs' situation is well out of the ordinary. Given the peculiarity of the case and Jaycee Dugard's entirely excusable ignorance of the facts that she claims lay behind her kidnapping and of the FTCA's limitations period, and even assuming, without deciding, that her cause of action did accrue upon her kidnapping, there has been sufficient evidence adduced for a reasonable fact finder to conclude that equitable principles would apply to toll the statute of limitations to the date of her rescue by authorities. The government's motion for summary judgment based on § 2401(b) is therefore DENIED.

## VI. Plaintiff A. Dugard has stated a valid cause of action under California law.

Under the FTCA, the United States waives immunity for injury only if a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred"—here, California. 28 U.S.C.

§ 1346(b)(1).  The government asserts that A. Dugard's claim "must be that, but for Defendant's negligence, Phillip Garrido would not have kidnapped and raped Jaycee and, consequently, she [A. Dugard] would never have been born."  ECF 107 at 72.  A. Dugard's claim, the government insists, must therefore be for "wrongful life by a healthy child," "a cause of action based on illegitimacy," "deprivation of a legal parent," a suit because her parent Garrido has "an unsavory reputation," or for the "deprivations of a normal childhood."  *Id.* at 72–74.  All of these causes of action are indeed disfavored in California caselaw, as the government notes.  *Id.*

Plaintiffs respond crisply: "A. Dugard seeks damages based on the actual injuries she suffered while living in captivity."  ECF 120 at 73.  That is, the injury is not her birth, but her continued "psychological and emotional distress" from being held captive, which, plaintiffs claim, "she would not have endured but for" the government's negligence in not following "its own policies and regulations."  *Id.* at 74.

Plaintiffs have the better argument.  There is no reason to stop the considerations of damage at "consequently, she would never have been born."  Rather, A. Dugard has pleaded in the SAC that:

> 38.  Jaycee's two daughters grew up with Jaycee in Garrido's backyard chamber. All three lived in a practical state of isolation. They received no medical care, no formal education, no contact with the outside world. Worse still, they were perpetually subject to Garrido's command and abuse.  Jaycee's two minor daughters, for example, were charged by Garrido with the daily care of his elderly, demented mother and, in that role, were frequently subject to having to wipe up and dispose of feces when Garrido's mother defecated herself.

> 39.  In addition to these abuses, Jaycee and her children were also psychologically and emotionally tortured by Garrido. Garrido controlled Jaycee and her children by intimidation and fear, leading Jaycee to believe that the Garrido home was a "haven" in comparison to the dangers of the outside world.

40.   Garrido robbed Plaintiffs of not just their minds, but their entire identities— even going so far as to manipulate Jaycee into denying to her own children that she was their mother, instead telling them that she was their older sister and that Nancy, Garrido's wife, was their mother.

ECF 65.  Those pleadings state facts sufficient to make plausible A. Dugard's claims of emotional and psychological damage as a result of the government's negligent supervision of Garrido that led to her captivity.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Those pleadings are thus sufficient to survive the government's motion to dismiss and motion for judgment on the pleadings.

A. Dugard has also adduced sufficient evidence of her psychological damage to survive the government's motion for summary judgment.  *See, e.g.*, ECF 120 Ex. G (Deposition of A. Dugard) at 217:1–6[35];  91:14–21.[36]  A. Dugard also testified that she called her own mother "Alyssa" and was told that Jaycee was her older sister while Mrs. Garrido was "mom," *id.* at 107:7–10, that she was made to care for Mr. Garrido's demented mother, which she said was "awful," *id.* at 115:19–6, and that she slept outside in tents, *id.* at 97:20–22.  She also stated that she used a port-a-potty and showered with a hose.  *Id* at 100:3–20.  In the light



most favorable to this plaintiff, a reasonable factfinder could conclude that she suffered physical and mental damage as a result of the government's alleged negligent supervision of Garrido.

The proximate cause element of A. Dugard's claim, however, is the same as Jaycee Dugard's: that, but for the parole officers' negligence, Garrido would not have been able to kidnap Jaycee Dugard on June 10, 1991, and thus later subject A. Dugard to harm.  This court has already made its rulings in Section IV above on the government's motions for summary judgment on the proximate cause element of Plaintiffs' claims.  Those rulings apply to A. Dugard's claims, and thus only the alleged negligence of the government between July and October 1990 and in January 1991 survive the government's motion for summary judgment.

## Conclusion

1.    This court GRANTS the United States' Motion to Dismiss and for Summary Judgment as to ground I, lack of any duty of reasonable care owed to Plaintiffs by the United States under California law, and DISMISSES this action for lack of subject matter jurisdiction.


2.    This court DENIES United States' Motions to Dismiss for lack of subject matter jurisdiction and for Summary Judgment as to ground II—the application of the discretionary function exception to the FTCA—for any alleged negligent failure to perform the following mandatory duties: 1) to make personal contact with Garrido monthly; 2) to file a supervision report about Garrido with the Parole Commission after 24 months of supervision that included reports of his parole violations; 3) to report Garrido's drug violations to the Commission; 4) to report to

52

the Commission Garrido's failure to submit monthly reports in October and November 1990; 5) to report to the Commission Garrido's violations of any special conditions of his parole, including the condition that he not consume alcohol to excess and appear for drug testing and counseling; and 6) to report incidents of "flushing" as part of the duty to report drug violations.  This court GRANTS the United State's motions as to the following alleged duties: 1) to report to the Commission violations that, "in the opinion of the parole officer," are part of a "continuing pattern of infractions"; 2) to report to the Commission violations under "circumstances which lead the probation officer to believe the releasee is abusing controlled substances on an on-going basis"; and 3) any duties laid out in Monograph 109, *The Supervision of Federal Offenders*.


3.      This court DENIES the United States' Motions as to ground III, absolute judicial immunity.


4.      This court GRANTS the United States' Motions to Dismiss and for Summary Judgment as to ground IV—the inability of the Plaintiffs to show that the United States' alleged negligence was a substantial factor in causing Plaintiffs' claimed injuries—as to any alleged omission on the part of the government's employees to perform the following duties: 1) to make personal contact with Garrido monthly; 2) to complete an initial supervision plan for Garrido within thirty days of the beginning of his federal supervision, or 3) to report, as required, to the Parole Commission Garrido's violations of his parole or special conditions thereof before November, 1989.  This court DENIES the United States' Motions to Dismiss and for Summary Judgment as to alleged failures by government

employees to report, as required, to the Parole Commission Garrido's violations of his parole or special conditions thereof 1) between July and October 1990, and 2) in January, 1991.

5.      This court DENIES the United States' Motions to Dismiss and for Summary Judgment as to ground V, that Plaintiffs' claims are "forever barred" under 28 U.S.C. § 2401(b) because they were not presented to the "appropriate Federal agency" within two years after Plaintiffs' claims accrued.

6.      This court DENIES the United States' Motion to Dismiss as to ground VI, that A. Dugard fails to state a cause of action under California law.

7.      This court ORDERS that this disposition be filed UNDER SEAL.  This Order may be unsealed by agreement of the parties with leave of this court.

IT IS SO ORDERED

DATED: October 11, 2013


_____/s/ Carlos T. Bea_____

Hon. Carlos T. Bea, District Judge